Filed 1/9/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

<table>
<tr><td>

CENTRAL VALLEY HOSPITALISTS,
    Plaintiff and Respondent,

v.

DIGNITY HEALTH,
      Defendant and Appellant.

</td><td>

A148742

(San Francisco County
Super. Ct. No. CGC15549691)

</td></tr>
</table>

The anti-SLAPP dismissal process has been described as manifesting the " 'Legislature's objective of providing a quick and inexpensive method for unmasking and dismissing' " unmeritorious cases. (*Sylmar Air Conditioning v. Pueblo Contracting Services, Inc*. (2004) 122 Cal.App.4th 1049, 1055–1056.) And it has accomplished that salutary objective, allowing the early dismissal of cases coming within anti-SLAPP on which plaintiff cannot prevail.

At the same time, the anti-SLAPP process has been criticized in some respects, including by this court in *Grewal v. Jammu* (2011) 191 Cal.App.4th 977 (*Grewal*), where we discussed for several pages particular "ways in which the anti-SLAPP procedure is being misused—and abused." (*Id*. at pp. 998–999.) We ended our opinion with a section entitled "A Losing Defendant's Right to Appeal Is the Aspect of the Anti-SLAPP Statute Most Subject to Abuse," describing how an unmeritorious—if not frivolous—appeal will result in an inordinate delay of the plaintiff's case and unnecessary legal fees. We noted we were not the first court to recognize possible misuse of anti-SLAPP. (See *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th. 180, 195.) And we were certainly not the last. (See, e.g., *Hewlett-Packard Co. v. Oracle Corp.* (2015) 239 Cal.App.4th 1174, 1184–1187.)

1

Here, we consider an appeal that once again warrants criticism about such abuse, in a setting where defendant seeks to extend SLAPP where it has never gone before. Plaintiff, a group of doctors, sued defendant hospital, alleging five causes of action essentially for unfair business practices and interference, a complaint that expressly alleged it was not based on any "wrongs or facts arising from any peer review activities." The complaint was conclusory in nature, with little factual support alleged, a complaint, it developed, that would not withstand demurrer. Disregarding the express pleading, defendant filed an anti-SLAPP motion, contending that while plaintiff did not state a claim, to the extent it could it *had* to be based on peer review—and thus on protected activity. Defendant also filed a demurrer, which was ultimately stipulated to while the SLAPP motion was under submission.

The trial court denied the SLAPP motion, in a thoughtful, comprehensive—and manifestly correct—order, that concluded with this: "Since the stipulated . . . order [sustaining the demurrer] provides for [plaintiff] to file a first amended complaint now that [defendant's] anti-SLAPP motion has been denied and case law permits the filing of an anti-SLAPP motion directed to an amended complaint, it is possible that a true first prong determination based on actually alleged acts committed by defendants may be needed in this case."

That was not sufficient for defendant, which appealed the denial of its anti-SLAPP motion. So here we are, 22 months—and untold attorney fees—later, addressing defendant's appeal. We affirm.

## BACKGROUND

### The Parties and the Relationship

Dignity Health is a California nonprofit public benefit corporation that operates 40 hospitals in California, Arizona, and Nevada, providing health care, education, and other benefits to the communities in which it operates. One of the hospitals is an acute care hospital in Stockton, operating under the name St. Joseph's Medical Center (Hospital or SJMC).

Central Valley Hospitalists (CVH) is a medical corporation that provided hospitalist services at the Hospital. A "hospitalist" is a physician who works exclusively in a hospital, as opposed to having an office practice. They are typically used by primary care physicians who cannot be available at all hours to respond to hospital emergency rooms or to attend to their patients in the hospital. CVH was founded by Sundar Natarajan, M.D., who before forming CVH had worked for Dignity Health as its first hospitalist at SJMC.

## The Complaint

On December 31, 2015, represented by a small law firm in Sacramento, CVH filed a complaint against Dignity Health alleging five causes of action, styled as follows: (1) unfair business practices in violation of Business and Professions Code section 17200; (2) intentional interference with contractual relations; (3) intentional interference with prospective economic relations; (4) negligent interference with prospective economic relations; and (5) inducing breach of contract. The complaint began with a three-page "definitions of special terms in the complaint," which included " 'Hospitalist,' " " 'Primary care physicians,' " and " 'Privileges.' " These four definitions followed:

"g. 'Peer review' refers to the process of organized professional review of medical practitioners within a medical group, hospital, or similar entity which fits within the definition of a 'peer review body' referenced in California Business and Professions Code § 805.

"h. 'Section 805 Report' refers to a report to the California Medical Board by a peer review body indicating certain negative peer review activity such as denial or revocation of privileges, or resignation of privileges or withdrawal of an application for privileges after receiving notice of a pending peer review investigation. (Cal. B&P Code §805(b), (c).) In practice, a Section 805 Report is a negative mark on a physician's record of practice and may negatively affect future practice options.

"i. 'Peer review discovery privilege' refers to the discovery and admissibility privilege concerning certain records an [*sic*] activities of a peer review process, as granted by California Evidence Code § 1157.

3

"j. 'Peer review liability privilege' refers to the limited immunity to suit granted with respect to certain communications (when made without malice) related to evaluation of medical personnel, as granted by California Civil Code § 43.8. (*See*, *Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709.)"

Then, following a two-page statement of parties, there were these "general factual allegations,"

"10. St. Joseph's Medical Center (hereafter SJMC) in Stockton California is a Hospital operated by DIGNITY HEALTH.

"11. CVH is a Medical Group operating at SJMC, and provides Hospitalist services to inpatients at that Hospital.

"12. CVH has agreements and active economic relationships with certain Primary Care Physicians in the greater Stockton area in which CVH agrees to provide care to patients of those Primary Care Physicians and they agree to designate CVH as the default Hospitalists to care for those of their patients who are hospitalized at SJMC.

"13. CVH competes for business with Medical Groups that are closely affiliated with DIGNITY HEALTH, including but not limited to DOE 1. When patients are admitted to SJMC as inpatients, if they are not seen by CVH, and they are insured, then they are typically seen by one of the Medical Groups closely affiliated with DIGNITY HEALTH.

"14. CVH's business model is essentially to provide high quality care to patients, placing patient outcome as the first priority. CVH's focus on positive patient outcome results in CVH physicians being readily willing to provide appropriate care, without being unduly controlled by concerns about SJMC's profitability.

"15. CVH's practices at times create costs for SJMC. For instance, if an inpatient would benefit from a medical procedure, and a CVH physician orders the procedure, this creates a cost of care for SJMC. SJMC pays for the cost of that procedure using the money paid by the patient's insurer. Reducing the number of such procedures increases SJMC's profitability.

"16. SJMC, as a Hospital owned by DIGNITY HEALTH, ostensibly is a

4

non-profit. However, it places a great internal emphasis on profitability. SJMC has complained to CVS on multiple occasions about profitability issues . . . .

"17. Because CVH refuses to change its practices regarding patient care, DIGNITY HEALTH has taken inappropriate action as alleged herein, including: (1) inducing certain CVH physicians to leave CVH; (2) harassing CVH physicians while they are at SJMC; (3) discouraging physicians from working with CVH; (4) referring CVH patients to DIGNITY HEALTH-related home health care providers without the appropriate CVH physician's orders."

The final general allegation alleged this:

"18. This Complaint does not allege wrongs or facts arising from any privileged peer review activities. Any reading of this Complaint which would implicate such activities is disavowed as excluded from this specific litigation."

There followed the five causes of action, all of which incorporated the earlier allegations, which alleged that among other things that Dignity Health: induced particular CVH physicians to leave; harassed CVH physicians; discouraged physicians from working with CVH; referred CVH patients to other health care providers without appropriate orders; intimidated CVH staff; interfered with CVH physicians' care of their patients; poisoned and/or disrupted the relationship between CVH and its physicians; induced the physicians to breach agreements and understandings with CVH; and made SJMC such an unpleasant and unprofessional environment that CVH-affiliated physicians quit and went elsewhere to practice, including to work directly for Dignity Health or its business partners.

Following service of the complaint, on March 1, 2016, Craig Rutenberg, an attorney at Manatt, Phelps & Phillips, LLP (Manatt), sent an e-mail to CVH's attorney Joshua Watson advising that Dignity Health intended to demur to the complaint, and requested to meet and confer pursuant to Code of Civil Procedure section 430.41. Later that day, Mr. Watson conferred by telephone with Mr. Rutenberg. Mr. Watson reiterated, as specifically alleged in the complaint, that CVH was not putting peer review at issue and offered to "explore amending the Complaint if there was confusion." Mr. Watson

5

provided Dignity Health with an extension of time to respond to the complaint. Mr. Rutenberg made no mention of filing an anti-SLAPP motion.

## The Anti-SLAPP Motion

A week later, represented by Manatt, Dignity Health filed a special motion to strike pursuant to Code of Civil Procedure, section 425.16 (anti-SLAPP motion), set for hearing on April 11. The anti-SLAPP motion was accompanied by a 23-page memorandum, and a two-volume, 210-page appendix of evidence. The appendix had 16 exhibits, among which were the declaration of Donald Wiley, president and CEO of Dignity Health, the bylaws and rules and regulations of the Hospital, various correspondence between doctors at Dignity Health and CVH, and six articles pertaining to hospitals and hospital care.

The essence of the anti-SLAPP motion argued that: "Specifically, this lawsuit challenges protected activity because it arises out of the physician peer review process—which the California Supreme Court has confirmed is an 'official proceeding authorized by law'—and thus it falls within the scope of subdivision (e)(2) of Section 425.16. *Kibler v. Northern Inyo County Local Hosp. Dist.*, 39 Cal.4th 192 (2006). This lawsuit also challenges activity protected under subdivision (e)(4) of Section 425.16 because physician peer review is a public issue and an issue of public interest, as is the delivery of healthcare generally. Further, CVH cannot show a probability of prevailing on the merits of its causes of action, which all fail for one or more reasons."

On March 10, Mr. Watson sent a facsimile letter to Mr. Rutenberg, once again confirming that the lawsuit was not about any peer review matter regarding Dr. Natarajan or other physicians. Mr. Watson's letter ended with this: "I respectfully ask that you withdraw your Special Motion to Strike at this time. If your client wishes, we will agree to amend the Complaint to a mutually satisfactory degree to clarify that no peer review is at issue, and will enter into a stipulation that peer review information will not be offered as evidence in this matter. (This would be a bilateral agreement.) Although I believe the Complaint already makes the scope of the pleadings clear, I offer this as an olive branch and a place to start discussions with your client. I am open to other options if they are

6

promptly presented by your client.  [¶]  Alternatively, if CVH is forced to engage in the expense and effort to oppose this Anti-SLAPP motion, we will regretfully seek attorneys fees as contemplated by CCP §§ 128.5, 425.16."

Mr. Rutenberg responded by letter of March 14, stating that CVH's allegations "do nothing to refute the showing that CVH's claims arise from protected activity."  His letter further said that, "[a]s we discussed during our March 1 . . . meet and confer, CVH's Complaint does not allege any facts to support its claims," and "the Complaint merely pleads a series of legal conclusions."  Finally, the letter declined the offer to stipulate to exclude peer review material from the case.

CVH filed opposition to the anti-SLAPP motion, arguing that the complaint was not based on peer review, and thus not protected activity.  The opposition was accompanied by four declarations, from three doctors and attorney Watson.  Dignity Health filed a reply.

We momentarily digress from the anti-SLAPP chronology to note a development below that is not even mentioned in Dignity Health's opening brief—its March 22 filing of a demurrer, set for hearing on May 9.

The anti-SLAPP motion came on as scheduled on April 11, before the Honorable Harold Kahn, a most experienced jurist, not least in the anti-SLAPP area, as he had heard "dozens, if not hundreds" of anti-SLAPP motions.  Judge Kahn had entered a tentative ruling denying the motion, which Dignity Health contested.  Following the appearances of counsel, Judge Kahn began the hearing with this statement to the attorneys for Dignity Health:

"THE COURT:  So, Mr. Rutenberg and Ms. Shenfeld, I would call your motion an aggressive one.  Let me give you my thoughts a little bit more.  You've probably seen the way I do business around here.  I spend a lot of time with every case, and I try to make sure that I understand it.

"In my view, while the cases do refer to looking at evidence to determine prong one, it can't possibly be right that evidence can trump the language in a complaint as to the facts, not the labels.  Clearly, labels are to be disregarded.

7

"But as to facts that are pled in the complaint, I can't understand how prong one analysis makes sense to look at facts that are different than the facts alleged in the complaint, and say that the real facts are what's in the declarations and that the false facts are what's pled. Because I think prong one is essentially a pleading analysis, but we do have the cases that say you need to look at evidence.

"Well, why do you need to look at evidence?

"And the only explanation that I can have that is consistent with the language of the cases and the results is, you need to look at the evidence to determine whether the labels assigned are the correct labels, not whether the facts themselves are.

"Certainly, neither side cited to any decision as we have here, where there's an explicit disclaimer. You think the disclaimer is a bunch of garbage and a clear way to avoid an obvious Anti-SLAPP motion, and that in that respect, the disclaimer is nothing more than the impermissible labels that was used in the—you didn't put it this way, but I certainly could glean from your papers—nothing more than the impermissible labels that have been disregarded in other cases. I don't think so.

"I think that the controlling rule is a simple one. The drafter of the complaint is the master of the complaint, and gets to choose what his claim, or in this case its claim, is all about, and what it's based on, what it arises from, to use the language of the Anti-SLAPP statute.

"Do I have 100 percent confidence? Of course not.

"Have you written an impressive motion? Absolutely.

"Do I think if I confirm my tentative that this might result in a published decision? I do. But I still think my tentative is right.

"All that said, now it's your time to tell me what I've gotten wrong."

They tried, at some length, at the conclusion of which Judge Kahn took the motion under submission, with this closing colloquy:

"MR. WATSON: Even if that is true, that would be an issue for a demurrer to clarify.

"Now, I would say you can resolve any question about what the case is about with a simple set of form rogs. But I understand if they need a more exact complaint, that could be done through an amended complaint.

"There is a difference between them saying we're not quite clear on the complaint and saying that this is an Anti-SLAPP. Right? You can have a defective complaint, which is not Anti-SLAPP, and by excluding peer review.

"THE COURT: They're not saying that. They're saying that what the complaint says is clearly wrong, and here are the facts why.

"MR. WATSON: But the only way they can do that is to ignore what the complaint says.

"THE COURT: Correct.

"MR. WATSON: Right. And that doesn't satisfy the first prong.

"THE COURT: That's the issue I'm taking under submission."

Following the hearing, both sides filed what Judge Kahn called "additional unsolicited briefing on the first prong" of the anti-SLAPP analysis.

Meanwhile—and another fact ignored by Dignity Health's brief—before the anti-SLAPP motion was ruled on, the demurrer was sustained, as described in the register of actions entry for May 9: "Defendant Dignity Health's demurrer to complaint is sustained with twenty days leave to amend from the date of filing of an order denying the pending anti-SLAPP motion in whole or in part. In the event that the pending anti-SLAPP motion is granted in its entirety, the complaint will be stricken and plaintiff will not be given leave to amend."

On June 6, Judge Kahn filed his order denying the anti-SLAPP motion. The order, prepared by Judge Kahn himself, was comprehensive indeed, beginning with his exposition of the law governing the anti-SLAPP analysis. Judge Kahn then turned to the issue at hand: "As discussed at length at the hearing, CVH's complaint does not allege any 'acts' (i.e., it did not plead any 'facts') stating what Dignity Health did or did not do which form the basis of CVH's claims. The pertinent allegations in the complaint are found in paragraphs 17 and 18. Paragraph 17 alleges that Dignity Health 'has taken

9

inappropriate action . . . including: (1) inducing CVH physicians to leave CVH; (2) harassing CVH physicians while they are at SJMC; (3) discouraging physicians from working with CVH; (4) referring CVH patients to Dignity Health-related home health care providers without the appropriate physician's orders.' Paragraph 18 alleges that 'This Complaint does not allege wrongs or facts arising from any privileged peer review activities.' The quoted allegations are conclusions which must be disregarded in making the first prong determination, as counsel for Dignity Health argued at the hearing.

"Once the conclusions of paragraphs 17 and 18 are disregarded, the complaint is silent as to any factual basis for any of CVH's claims. Not a single act or fact is alleged to support any of the five claims asserted in the complaint. Dignity Health attempts to fill this gap by submitting evidence that it committed no wrongdoing and that all of its actions with regard to CVH and its physicians arise from peer reviews of CVH physicians. But Dignity Health cites no authority, nor could I locate any, that permits a defendant making an anti-SLAPP motion to satisfy its first prong burden by its own evidence of what it believes the plaintiff's claims are based on.

"What little authority there is on this point establishes that where, as here, a plaintiff does not allege any acts committed by the defendant supporting the plaintiff's claims, the defendant necessarily is unable to meet its first prong burden of showing that the defendants' acts alleged by the plaintiff arise from protected activity. Just to state the point is to show its truism. If there are no acts alleged, there can be no showing that alleged acts arise from protected activity. And, if there cannot be such a showing, the first prong is not satisfied and the anti-SLAPP motion must be denied. The clearest case illustrating this point is *Martin v. Inland Empire Utilities Agency* (2011) 198 Cal.[App.]4th 611, 627–28, which was not cited by either side."

Judge Kahn went on to quote at length from *Martin v. Inland Empire Utilities Agency, supra*, 198 Cal.App.4th 611 (*Martin*), concluding that discussion as follows: "Just like the court in *Martin* could not presume that all statements made by the defendants in that case constitute acts of protected activity, case law teaches that I cannot presume that all conduct of Dignity Health regarding CVH and its physicians arise from

10

protected peer review activities. (*See, e.g., DeCambre* [*v. Rady Children's Hospital-San Diego* (2015) 235 Cal.App.4th 1] (alleged acts of defendant hospital toward the plaintiff physician forming the bases for plaintiff's claims for harassment, intentional infliction of emotional distress and defamation did not arise from protected peer review activities); *Smith* [*v. Adventist Health System/West* (2010) 190 Cal.App.4th 40] (alleged act of defendant hospital group of screening out plaintiff physician's application for hospital privileges did not arise from protected peer review activities))."

Finally, after citing another case (*Freeman v. Schack* (2007) 154 Cal.App.4th 719, 732–733), Judge Kahn concluded as follows: "The sum of all of the above is that any first prong determination that Dignity Health has made a prima facie showing that acts allegedly committed by it arise from protected peer review activities must necessarily be deferred until CVH alleges acts committed by Dignity Health. Since the stipulated May 9, 2016 order provides for CVH to file a first amended complaint now that Dignity Health's anti-SLAPP motion has been denied and case law permits the filing of an anti-SLAPP motion directed to an amended complaint (*Country Side Villas Homeowners Assn. v. lvie* (2011) 193 Cal.App.4th 1110, 1116), it is possible that a true first prong determination based on actually alleged acts committed by defendants may be needed in this case."

Dignity Health appealed the order.

## DISCUSSION

### Introduction to the Analysis

Dignity Health has filed a 58-page, 13,926-word opening brief. It cites 63 cases, 17 statutes (or subdivisions of statutes), an opinion of the Attorney General, and CACI. Its reply brief is 30 pages. It is a prodigious effort to be sure, an effort that undoubtedly cost many thousands of dollars in attorney fees to prepare—and, of course, tremendous attorney fees for CVH to respond, witness its 64-page respondent's brief.

Dignity Health's opening brief has a 33-page argument. Following brief recitation of the standard of review and the anti-SLAPP statute, Dignity Health argues that the

11

complaint arises out of protected activity, an argument that has two subparts, which we quote:

"1. The Court Erred in Allowing CVH's Artful Pleading to Avoid the Anti-SLAPP Protections Granted by the Legislature. . . .

"a. On Prong One, a Court Must Consider Admissible Evidence. . . .

"b. Allowing a Plaintiff to Plead Around the Anti-SLAPP Statute by Omitting Key Factual Allegations Conflicts With the Policy of the Anti-SLAPP Statute. . . .

"c. The Court's Ruling Was Based on Erroneous and Unsupported Premises. . . .

"d. The Court's Cited Authority Does Not Support Its Ruling. . . .

"2. CVH's Lawsuit Arises Out of the Peer Review Process. . . .

"a. The Peer Review Process Is Protected Activity Under Subdivision (e)(2) of the Anti-SLAPP Statute. . . .

"b. Peer Review Is Also Protected Under Subdivision (e)(4) of the Anti-SLAPP Statute Because It Is 'in Connection With an Issue of Public Interest.' . . . .

"c. CVH's Complaint Arises From Protected Peer Review. . . ."

We reject the argument—Dignity Health is very wrong.[1]

### Anti-SLAPP Law and the Standard of Review

In *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, we explained the operation of the anti-SLAPP law in both the trial and reviewing courts:

"Subdivision (b)(1) of section 425.16 provides that '[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the

---

[1] We also reject Dignity Health's request for judicial notice filed December 6, 2016, which is denied.

12

plaintiff will prevail on the claim.' Subdivision (e) of section 425.16 elaborates the four types of acts within the ambit of a SLAPP . . . .

"A two-step process is used for determining whether an action is a SLAPP. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity, that is, by demonstrating that the facts underlying the plaintiff's complaint fit one of the categories spelled out in section 425.16, subdivision (e). If the court finds that such a showing has been made, it must then determine the second step, whether the plaintiff has demonstrated a probability of prevailing on the claim. [Citation.]

" 'The Legislature enacted section 425.16 to prevent and deter "lawsuits [referred to as SLAPP's] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) Because these meritless lawsuits seek to deplete "the defendant's energy" and drain "his or her resources" [citation], the Legislature sought " 'to prevent SLAPPs by ending them early and without great cost to the SLAPP target' " [citation]. Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation.' [Citation.]

"Finally, and as subdivision (a) of section 425.16 expressly mandates, the section 'shall be construed broadly.'

"With these principles in mind, we turn to a review of the issues before us, a review that is de novo. [Citation.]" (*Hecimovich v. Encinal School Parent Teacher Organization, supra,* 203 Cal.App.4th at pp. 463–464.)

**The Complaint is Not Based on Protected Activity**

As we have put it, "In order for a complaint to be within the anti-SLAPP statute, the 'critical consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity.' (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.) To make that determination, we look to the 'principal thrust or gravamen of the plaintiff's cause of action.' (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188, italics omitted; see *Dyer v. Childress* (2007) 147 Cal.App.4th

13

1273, 1279.)" (*Moriarty v. Laramar Management Corp.* (2014) 224 Cal.App.4th 125, 133–134 (*Moriarty*).)

The Supreme Court has recently put it this way: "A claim arises from protected activity when that activity underlies or forms the basis for the claim. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78; *Equilon Enterprises v. Consumer Cause, Inc.* [(2002)] 29 Cal.4th [53,] 66; *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1114.)" (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1062–1063 (*Park*).) As the Supreme Court earlier instructed, at this first step of the anti-SLAPP analysis, "the moving defendant bears the burden of identifying all *allegations* of protected activity, and the claims for relief supported by them." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396, italics added.) Or, as we said in another SLAPP case—there, in affirming an order granting an anti-SLAPP motion—"[t]he question is what is pled—not what is proven." (*Comstock v. Aber* (2012) 212 Cal.App.4th 931, 942.) And we accept as true CVH's pleaded facts. (*Young v. Tri-City Healthcare Dist.* (2012) 210 Cal.App.4th 35, 54; *Freeman v. Schack, supra*, 154 Cal.App.4th at p. 733.)

The complaint was, as noted, factually inadequate in supporting detail. That said, the essence of CVH's case can be gleaned from it and the declarations filed in opposition to the anti-SLAPP motion. That case includes among other things that Dignity Health interfered with the hiring and/or retention of CVH staff by inducing key physicians to quit CVH and work for Dignity Health's partner, Sound Physicians; harassed CVH physicians to the point they quit; refused to provide privileges application paperwork to physicians who wanted to join CVH; meddled in patient care in ways that endangered patient safety and increased malpractice risks; and inappropriately targeted CVH's primary care patients. That was the case.

Not only that, CVH said it was not suing about peer review; expressly excluded peer review from the complaint; offered to stipulate that there would be no discovery as to peer review; and offered to amend the complaint to clarify the bases of the business

torts at issue. No matter to Dignity Health. Ignore all that. Ignore what was pleaded. The case was peer review.

Defendant in *Moriarty* contended that the protected activity there was an unlawful detainer case it had filed against the plaintiff, an unlawful detainer case that was nowhere mentioned in plaintiff's complaint. Defendant nevertheless attempted to construe plaintiff's complaint as based on that action, an effort we described as a "selective reading of Moriarty's complaint [that] is inappropriate." (*Moriarty, supra,* 224 Cal.App.4th at p. 135.) The setting here is a fortiori, as peer review is not only not referred to in CVH's complaint, it is expressly not involved.

*Medical Marijuana, Inc. v. ProjectCBD.com* (2016) 6 Cal.App.5th 602, is persuasive—if not on point. There, the court affirmed the denial of an anti-SLAPP motion with this language: "It would be inappropriate for us to insert into a pleading claims for relief based on allegations of activities that plaintiffs simply have not identified, even if the parties suggest on appeal how plaintiffs might have intended to frame those claims or attempt to identify the specific conduct or assertions of statements alleged to be false on which plaintiffs intended to base such claims for relief. It is not our role to engage in what would amount to a redrafting of the first amended complaint in order to read that document as alleging conduct that supports a claim that has not in fact been specifically alleged, and then assess whether the pleading that we have essentially drafted could survive the anti-SLAPP motion directed at it." (*Id.* at p. 621, fn. omitted.)

*Martin*, the case discussed at length by Judge Kahn, is also persuasive. Affirming what the court described as a "functional" denial of the anti-SLAPP motion, it noted as follows: "[D]efendants failed to make an initial prima facie showing on the first prong of the anti-SLAPP statute; in other words, defendants did not meet their burden to show that the allegedly defamatory statements were based on an act in furtherance of defendants' rights of petition or free speech. Indeed, it is difficult, if not impossible, to see how defendants could have met this burden with plaintiff's failure to specifically plead the allegedly defamatory statements. . . . [S]ection 425.16 has no mechanism for simply skipping over the first prong—defendants' burden to show the statements were protected,

15

and go directly to the second prong—plaintiff's burden to show a probability of prevailing." (*Martin*, *supra*, 198 Cal.App.4th at pp. 627–628.)

Two sentences of Judge Kahn's order bear repeating, as they succinctly sum up the holding here: "If there are no acts alleged, there can be no showing that alleged acts arise from protected activity." Or, as he put it earlier, he could not accept evidence based solely on what Dignity Health "believes [CVH's] claims are based on."

As noted, Dignity Health has filed lengthy briefs, citing numerous cases and authorities. We will not respond in similar fashion, as we view Dignity Health's position to be similar, if not identical, to that rejected in *Nam v. Regents of University of California* (2016) 1 Cal.App.5th 1176. Nam, a former resident at a state university hospital, filed a complaint for retaliation, discrimination, sexual harassment, wrongful termination, and breach of contract. Defendant Regents filed an anti-SLAPP motion, contending that Nam's complaint arose from written complaints made in connection with an official proceeding. The trial court denied the motion. The Court of Appeal easily affirmed, describing defendant's argument as "stitching together a number of disparate legal principles extracted from cases with very different facts, *ignoring the fundamental question whether the lawsuit is indeed a SLAPP*, and divorcing the analysis from the purpose of the anti-SLAPP law, defendant constructs an argument that, in effect, would subject most harassment and retaliation claims against public entities to an anti-SLAPP motion to strike." (*Id*. at p. 1186.) This aptly describes Dignity Health's position here.

We end the discussion with an observation about *Kibler v. Northern Inyo County Hospital Dist.*, *supra*, 39 Cal.4th 192 (*Kibler*), as noted, the primary case on which the anti-SLAPP motion was based. As Dignity Health first describes it here: "The Supreme Court has made clear that physician peer review is protected conduct under the anti-SLAPP statute. See *Kibler* . . . ." Or, as it later elaborates: "In *Kibler*, . . . the Supreme Court ruled definitively that physician peer review is protected under the anti-SLAPP laws because it is an 'official proceeding authorized by law.' *Id*. at 199 (citing Code Civ. Proc. § 425.16 (e)(2)). The *Kibler* Court defined 'peer review' broadly, as 'the process by which a committee comprised of licensed medical personnel at a

hospital "evaluate[s] physicians applying for staff privileges, establish[es] standards and procedures for patient care, assess[es] the performance of physicians currently on staff," and reviews other matters critical to the hospital's functioning.' *Id*. at 199. *Kibler* extends the protections of the anti-SLAPP law to peer review because lawsuits like CVH's would discourage peer reviewers from ever stepping to the fore in order to protect patient health and safety. That is because 'membership on a hospital's peer review committee is voluntary and unpaid, and many physicians are reluctant to join peer review committees so as to avoid sitting in judgment of their peers.' "

*Kibler* is hardly all that Dignity Health cracks it up to be, as shown by the Supreme Court's discussion of it in *Park*. Park, a professor of Korean origin, was denied tenure, after which he brought a national origin discrimination claim against the university. The trial court denied the university's anti-SLAPP motion, but the Court of Appeal reversed. The Supreme Court reversed the Court of Appeal, holding that the tenure decision was not a protected activity. The elements of the claim depended only on the denial of tenure itself and whether the motive for that action was impermissible. While the tenure decision might have been communicated orally or in writing, that communication did not convert the lawsuit to one arising from such speech. (*Park, supra*, 2 Cal.5th 1057.) And reaching that holding, this is what the Supreme Court had to say about one of defendant's arguments:

"Second, the University urges that its tenure decision and the communications that lead up to it are intertwined and inseparable. It bases this argument on *Kibler* . . . and *Kibler*'s progeny, which it contends establish that decisions and the deliberations that underlie them are indistinguishable for anti-SLAPP purposes.

"*Kibler* lends no support. There, the plaintiff doctor sued a hospital and various individual defendants for defamation and related torts. The trial court in *Kibler* found, and we accepted for purposes of review, that these tort claims arose from statements made in connection with a hospital peer review proceeding. The only issue before us was whether, assuming this to be so, the peer review proceeding was an ' "official proceeding" ' within the meaning of the anti-SLAPP statute. [Citations.] That is, we

17

took for granted lower court findings as to what activity the tort claims arose from under section 425.16, subdivision (b)(1), and then considered whether that activity constituted protected activity under a particular portion of subdivision (e)'s statutory definition. We did not consider whether the hospital's peer review decision and statements leading up to that decision were inseparable for purposes of the arising from aspect of an anti-SLAPP motion, because we did not address the arising from issue. (See *Young v. Tri-City Healthcare Dist.*[*, supra,*] 210 Cal.App.4th [at p.] 58 [correctly recognizing *Kibler* addressed only whether hospital peer review proceedings can be ' "official proceedings," ' and courts resolving anti-SLAPP motions must still separately determine whether a given claim arises from any protected activity].)

"Applying our decision in *Kibler*, the Court of Appeal in *Nesson v. Northern Inyo County Local Hospital Dist.* (2012) 204 Cal.App.4th 65 concluded an anti-SLAPP motion against the claims of a doctor who alleged discriminatory and retaliatory termination of privileges was properly granted. The *Nesson* court reasoned that under *Kibler*, a hospital's peer review proceedings are official proceedings, and thus every aspect of those proceedings, including the decision to impose discipline, is protected activity for anti-SLAPP purposes. (*Nesson*, at pp. 78–79, 82–84.) Similarly, in *DeCambre*[*, supra,*] 235 Cal.App.4th 1, the Court of Appeal concluded *Kibler* dictated finding the allegedly discriminatory decision not to renew a doctor's contract to be protected activity. The court correctly considered the elements of the plaintiff's claims in order to identify what conduct underlay each cause of action. (E.g., *DeCambre*, at p. 22.) However, it also concluded, in reliance on *Kibler*, that every part of the peer review process was protected activity. To the extent the plaintiff's claims included as an essential element her termination, and that termination was a product of peer review, her claims arose from protected activity. (*DeCambre*, at pp. 14–16.)

"The University argues by analogy that all aspects of its tenure process, including its ultimate decision, are inextricably intertwined protected activity, and the Court of Appeal here agreed. But both *Nesson* and *DeCambre* overread *Kibler*, which did not address whether every aspect of a hospital peer review proceeding involves protected

18

activity, but only whether statements in connection with but outside the course of such a proceeding can qualify as 'statement[s] . . . in connection with an issue under consideration' in an 'official proceeding.' (§ 425.16, subd. (e)(2).) *Kibler* does not stand for the proposition that disciplinary decisions reached in a peer review process, as opposed to statements in connection with that process, are protected. We disapprove *Nesson v. Northern Inyo County Local Hospital Dist., supra*, 204 Cal.App.4th 65, and *DeCambre*[*, supra*,] 235 Cal.App.4th 1, to the extent they indicate otherwise." (*Park, supra*, 2 Cal.5th at pp. 1069–1070.)

### Some Closing Observations

On August 11, 2017 the clerk of our court sent a letter to counsel advising that "the court, acting on its own motion, is considering the imposition of sanctions on appellant and/or appellant's counsel in case No. A148742 for taking an appeal that is frivolous or filed for purposes of delay."

On August 14 our clerk's office received from Dignity Health's counsel a request for dismissal. We did not file it.

On August 14 we received from counsel for Dignity Health a 10-page single-spaced letter, attaching a 13-page letter to the California Supreme Court on behalf of the California Hospital Association, addressing a portion of the court's opinion in *Park* that discusses *Kibler*. Counsel's letter begins that it "opposes the imposition of sanctions . . . . This appeal has merit, is not frivolous, and was not prosecuted for any improper purpose such as to harass Respondent or to delay this lawsuit."

Following a paragraph of boilerplate sanction law, the third paragraph of counsel's letter says: "This appeal was brought and at all times prosecuted in utmost good faith, based on considered analysis of the facts and the case law, and not for purposes of delay. While we ultimately decided to dismiss this appeal because of our concern of the impact of a new California Supreme Court decision that substantially altered the way the law on the subject of anti-SLAPP motions in hospital-physician peer review cases had been interpreted—and informed the Court immediately by telephone of our intent to dismiss within hours of receiving client approval to dismiss—prior to that decision we believed

19

that the appeal was meritorious and worth pursuing.  We pursued the appeal not for reasons of delay, but because we believed the trial court made legal errors that deprived Dignity Health of the substantial advantages of obtaining dismissal of a case under the anti-SLAPP procedure.  However, we have now concluded that the trial court's error is likely to be deemed harmless in light of the decisions in *Park . . .* and *Bonni v. St. Joseph Health System* [(2017) 13] Cal.App.[5th 851] . . . .  As discussed in more detail below, sanctions are not appropriate."

The letter then spends three and a half pages explaining "the decision to bring and prosecute the appeal," and then another three and a half pages explaining why Dignity Health decided to request dismissal of the appeal when it did, both explanations, of course, that presuppose CVH's case was based on "peer review"—which it expressly was not.

In the course of its first attempt, counsel's letter has a passage that says "[n]or is there any indication of a purpose to harass or delay," this notwithstanding the 90 days of extension for the appellate briefing, or the months of delay of oral argument based on claimed scheduling conflicts.  We are not persuaded.

We note that three of the lawyers whose names appeared on the moving papers below are among the four lawyers listed on the briefs on appeal, two of whom appeared at the hearing below.  Necessarily the analysis on appeal is the same analysis as in the trial court, the classic case of de novo review.  Put otherwise, we do not understand how 90 days of extensions in an anti-SLAPP appeal can be a manifestation of anything but delay.  And as to the continuance of oral argument, while it was based on the schedule of the attorney who signed the appellate briefs, he did not even participate below—he did not sign the papers, he did not argue the motion.  He did appear at oral argument and sought to buttress the positions asserted in his letter.

*People ex rel. Lockyer v. Brar* (2004) 115 Cal.App.4th 1315 was an appeal by Brar, a losing defendant in an anti-SLAPP motion.  As the late Presiding Justice Sills described it in his inimitable fashion:  "Brar's appeal practically has the words 'brought

20

for reasons of delay' virtually tattooed on its forehead.  Consider that under a rule of automatic stay, . . . the incentive to appeal even the denial of a patently *frivolous* anti-SLAPP motion is overwhelming.  As we have noted, the defendant gets a very cheap hiatus in the proceedings . . . ."  (*Id*. at p. 1319.)

Dignity Health has no forehead, and in any event Dignity Health does not appear to be the responsible party here.  What may well be apt are these two sentences from our opinion in *Grewal*:  "A well-known saying, generally attributable to William Gladstone, is that 'Justice delayed is justice denied.'  A lesser known saying, known to be attributable to prominent defense lawyers from major law firms, is that 'Justice delayed is justice.' "  (*Grewal, supra*, 191 Cal.App.4th at p. 999.)

Our clerk's letter advised counsel for CVH that he could reply to the issue of sanctions.  He did not, so apparently he and his clients have no interest in the issue, this despite his earlier threat to Mr. Rutenberg.  We could, of course, order sanctions payable to the court (see *Estate of Gilkison* (1998) 65 Cal.App.4th 1443, 1451; *Singh v. Lipworth* (2014) 227 Cal.App.4th 813, 830), which would result in a mere $8,000 or so sanction (*ibid*.), but also the reporting of counsel to the State Bar.  (Bus. & Prof. Code § 6068, subd. (c).)  We are not inclined to do that here, and thus end the opinion with these observations and nothing more.

## DISPOSITION

The order denying the anti-SLAPP motion is affirmed.  CVH shall recover its costs on appeal.

21

_____

Richman, J.

We concur:

_____

Kline, P.J.

_____

Stewart, J.

A148742; *Central Valley Hospitalists v. Dignity Health*

22

Trial Court:   San Francisco County Superior Court

Trial Judge:   Hon. Harold E. Kahn

Counsel:

Manatt, Phelps & Phillips, Barry Scott Landsberg, Doreen Wener Shenfeld, Joanna S. McCallum and Craig Steven Rutenberg for Defendant and Appellant.

Clayeo C. Arnold, Joshua Haakon Watson for Plaintiff and Respondent.