Filed 1/29/19; Modified and Certified for Pub. 2/21/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RICHMOND COMPASSIONATE CARE COLLECTIVE, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> 7 STARS HOLISTIC FOUNDATION, INC., et al., <br><br>     Defendants and Appellants; <br><br> HOLISTIC HEALING COLLECTIVE, INC., et al., <br><br>     Defendants. | A153305 <br><br> (Contra Costa County <br> Super. Ct. No. MSC1601426) |

In 2014, we began our opinion in *Moriarty v. Laramar Management Corp.* (2014) 224 Cal.App.4th 125, 128 (*Moriarty*) with this observation: "Another appeal in an anti-SLAPP case. Another appeal by a defendant whose anti-SLAPP motion failed below. Another appeal that, assuming it has no merit, will result in an inordinate delay of the plaintiff's case and cause him to incur more unnecessary attorney fees. (See *Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 1002–1003.) And no merit it has." Here is yet another such appeal. And we again affirm.

## BACKGROUND

### The General Setting

In 2011, pursuant to Richmond Marijuana Ordinance No. 28-10 NS (ordinance), the City of Richmond issued a medical marijuana collective permit to Richmond

1

Compassionate Care Collective (RCCC). It was the first collective to obtain such a permit.

Three other permits were later issued over the ensuing years, to: (1) Richmond Patients Group (RPG), acting through principals William Koziol, Darrin Parle, and Alexis Parle; (2) Holistic Healing Collective, Inc. (Holistic), acting through its principal Rebecca Vasquez; and (3) 7 Stars Holistic Foundation, Inc. (7 Stars), acting through its principal Zeaad M. Handoush.

The ordinance had been adopted in 2010, and was from time to time amended, including in 2011, 2012, and 2014, when the ordinance was amended to reduce the number of dispensary permits from six to three, and also to provide that if a permitted dispensary did not open within six months after the issuance of a permit, the permit would expire and become void. RCCC ended up losing its permit.

**The Proceedings Below**

In July 2016 RCCC filed a complaint alleging a single cause of action, violation of the Cartwright Act. The complaint named 11 defendants: RPG, Holistic, 7 Stars, William and Alexis Koziol, Parle, Vasquez, Handoush, Lisa Hirschhorn, Antwon Cloird, and Cesar Zepeda. As indicated, eight of the defendants were the three collectives and three principals. As to the other three, Hirschhorn was alleged to be an agent of the other defendants (except Cloird and Zepeda), and Cloird and Zepeda were alleged to be the agents of the other defendants (except Hirschhorn).

The complaint alleged in essence that defendants, acting in concert, encouraged and paid for community opposition to RCCC's applications before the Richmond City Council and also purchased a favorably zoned property.

In October 2016, represented by five separate counsel, defendants filed a joint special anti-SLAPP motion to strike pursuant to Code of Civil Procedure section 425.16 (section 425.16). The motion was heard by the Honorable Barry Goode, a most experienced Superior Court judge, and on December 5 he granted the anti-SLAPP motion in an "opinion and order" that among other things held that "supporting and encouraging others to oppose Plaintiff's application before the City Council" were "statements or

2

conduct made in connection with . . . official proceedings" and "the location of a medical marijuana facility is not a public issue." And, he concluded, the allegations "related to efforts to mobilize public opposition to Plaintiff's application and to obtain a decision from the Richmond City Council . . . shall be stricken from the complaint. [But,] the allegations of the complaint related to the purchase of real property . . . shall not."

RCCC filed a First Amended Complaint and then a second, to both of which demurrers were sustained with leave to amend. Both demurrers were ruled on by Judge Goode.

In August 2017 RCCC filed its Third Amended Complaint (TAC). The complaint itself was 85 paragraphs, and also included 17 exhibits consisting of text images, emojis, and notes of defendant Hirschhorn—a defendant, it developed, who had turned on the other defendants and was now assisting RCCC.

On August 31, 2017 defendants 7 Stars and Handoush (collectively, 7 Stars) filed their own anti-SLAPP motion, along with a demurrer. The anti-SLAPP motion asked the Court to strike the claim for violation of the Cartwright Act, and also identified 28 specific paragraphs that 7 Stars claimed involved protected activity or appeared to incorporate by reference allegations of protected activity. The motion was set for hearing on October 12.

While 7 Stars' motion was pending, the RPG defendants filed their own anti-SLAPP motion, identifying specific allegations they sought to have stricken.

On September 28 RCCC filed its opposition to the 7 Stars anti-SLAPP motion, included within which was a declaration of Hirschhorn, testifying as to the facts that underlay the TAC. And what a declaration it was: 10 pages that set forth in detail what the defendants did to defendant RCCC, detail that supported Hirschhorn's testimony of a conspiracy among defendants to harm RCCC—their "war on RCCC." This is how Hirschhorn described it:

"Our group declared war on RCCC. We conspired to prevent RCCC from getting any property in Richmond. We discussed and presented leases, letters of intent to lease or purchase, and purchase agreements—all of which were bogus. The intent of these

3

phony real estate deals or leases, which were presented to landlords was to 'tie them up with paper.' Individuals in our group went door to door to landlords to ensure that they would not lease or rent their property to RCCC. As previously stated in this declaration, our group included Rebecca Vasquez, Zeaad Handoush, Jawad Dayem aka JJ, Adrian _____, Bill Koziol and Darrin Parle and Cesar Zepeda and Antwon Cloird.

"We had a list of names which we compiled to ensure that any landlord would not lease, nor sell any property to RCCC or anyone associated with RCCC. The list of names included John Valdez, Garib Karapetyan, Greg Serobyan, and attorneys, Brad Hirsch, James Anthony."

Hirschhorn's 25-paragraph declaration went on to describe in vivid detail all that "the group" did in furtherance of their conspiracy against RCCC. A few examples should suffice:

"16. Our activities included regularly visiting the City of Richmond website to determine what properties would be located in the appropriate zoning district. With this information, we would visit the property owners or their agents and pretend to be prospective purchasers or tenants. This would convince the property owner or agent to turn over its rent rolls which contained the lease termination date of the tenant leases or engage in phony lease negotiations. We would then contact the tenant whose lease was expiring in an attempt to persuade them to relocate to a premise that would otherwise be suitable for RCCC's needs. Our ideas included an offer to pay their cost of relocating and/or provide a few months of rent payments.

"17. One tactic our group used to dissuade property owners, property managers, or real estate agents from leasing to RCCC or its affiliates was to inform the owners, managers or agents that their properties were subject to federal forfeiture proceedings. This was a successful ploy as we scared property owners, property managers, and real estate agents from leasing to RCCC.

"18. Another successful ploy used by our group was to inform property owners, their managers or real estate agents that we would threaten to notify their lender that the owner was now leasing to a cannabis business. This threat of notifying their lender

4

would cause them to believe that their loan would be called by the lender. We particularly targeted properties where Wells Fargo was the lender. This scare tactic had its intended effect. Property owners, their managers or real estate agents refused to lease or sell to RCCC.

"19. Additionally, Bill Koziol and Zeaad Handoush formed a number of phony neighborhood coalitions to paper various neighborhoods or property owners with adverse consequences of introducing a cannabis related business into their community. This paper warfare also had its intended effect in keeping property owners, managers or agents from leasing to RCCC or its affiliates." And lest there be any doubt about all who were responsible, Hirschhorn said this:

"20. "To be clear, Zeaad Handoush, Bill Koziol, Darrin Parle, and Rebecca Vasquez were intimately involved in all matters throughout the time frame that I referenced in this declaration. Zeaad Handoush, Bill Koziol, and Rebecca Vasquez called many or all the shots concerning RCCC or John Valdez.

"21. Zeaad Handoush['s] express concern was that if RCCC got open for business it would diminish Zeaad Handoush's market presence in central and south Richmond. Zeaad Handoush and his cousin J.J. would express their dislike for RCCC and complain that they did not want a fourth dispensary in Richmond. Zeaad Handoush would often talk about maintaining three dispensaries only so that he could protect his market share as he anticipated that recreational cannabis would be available in Richmond.

"22. Bill Koziol and Darrin Parle were equally involved in all of the conduct expressed through this declaration. Indeed, Bill Koziol warned us that we were 'crossing past a point of no return' and our activities and/or conduct could be the subject of a lawsuit. Nevertheless, Bill led the charge for many of our activities. Bill made us aware that our activities directed at RCCC would potentially be the subject of a lawsuit and that we could get sued. Bill Koziol routinely said 'I'd rather pay $500,000 to defend my actions than to lose tens of millions of dollars in lost sales.'

"23. Rebecca Vasquez was also intimately involved as she vocalized often that she did not want RCCC or John Valdez to operate in Richmond. She did not want a

fourth dispensary to open. Rebecca would say in various group meetings 'that she [Rebecca] would rather pay agents to get these deeds done now as opposed to sharing sales with a fourth dispensary. I hate John. Fuck a fourth dispensary.' "

7 Stars' anti-SLAPP motion came on for hearing on October 12 before Judge Goode who had issued a tentative ruling denying the motion. The hearing began with argument by 7 Stars' attorney Mark Meyer, who had hardly begun when he was interrupted by Judge Goode telling him that his claimed description of RCCC's complaint was "not a fair telling of the complaint." This is how it went:

"MR. MEYER: So, 7 Stars and Zeaad Handoush have two motions, and I'll talk to the motion to strike first.

"JUDGE GOODE: Okay.

"MR. MEYER: So joining a group with the purpose of influencing local ordinances and putting in applications is protected, and that is the claim that the complaint makes against my clients.

"It says that they joined this group—quote unquote—and so the tentative, as I see it, is sort of sidestepping this issue.

"JUDGE GOODE: Can you show me where in the complaint, the latest version of the complaint we have which I'm calling up right now, you think that is alleged in the gravamen of the case.

"MR. MEYER: As what?

"JUDGE GOODE: As the gravamen of the case because I read the paragraphs that you cited, and with very minor exceptions I just didn't think it was a fair telling of the complaint.

"The [TAC] has a very different thrust than the first one did, so tell me where in the [TAC] you think you find the characterization that you're putting on it?"

And it was downhill for Meyer from there: on several occasions Judge Goode made similar observations, advising Meyer that his reading of the TAC was wrong and misleading, especially in light of Hirschhorn's declaration. The following passages are illustrative:

6

"JUDGE GOODE: Mr. Meyer, the declaration from Ms. Hirschhorn, which is very much echoed in the [TAC], says, for example, 'Our purpose was to take as many steps as necessary to prevent RCCC from buying or leasing any property in Richmond. We did not want RCCC to acquire or lease any property in Richmond from which RCCC could operate a Cannibis [sic] business.'

"She goes on to talk about all of the ways they sought to interfere with the efforts of the plaintiff to acquire property.

"All of the business about trying to influence the counsel, all the community meetings that you're talking about are largely gone from the [TAC].

"The [TAC] focuses on the behavior alleged of your client and others to cooperate to do anything they could to deprive the plaintiff of an opportunity to get a toehold in Richmond by acquiring a suitable piece of property.

"So, had you been here two or three months ago arguing with respect to a prior complaint, I would get it, but I'm reading the [TAC], and I'm reading Ms. Hirschhorn's declaration, and the gravamen of what I'm reading is very different from what I hear you arguing."

Meyer briefly responded, referring to "petitioning activities," to which Judge Goode said, apparently incredulous: "Who are your clients petitioning when they are going to landlords and real estate brokers and agents and saying, 'You better not lease to RCCC'? Who are they petitioning? Meyer replied, "That's not in the complaint that my client did that," to be immediately referred to paragraph 43 of the TAC which, Judge Goode said, refers to "the group, which I believe includes your client, conspired."

Meyer interrupted, speaking for 11 lines, after which this colloquy ensued:

"JUDGE GOODE: I'm sorry, are you saying that the group of conspirators as alleged has two purposes, one to influence public bodies, and, two, to lean on people to say, 'Nice property you have here. It would be a shame if something happens to it if RCCC leased it?' That because they have one protected activity, they can do anything they want that is anticompetitive in addition?

"MR. MEYER: No.

7

"JUDGE GOODE: I'm reading the complaint to allege the second set of actions.

"MR. MEYER: But what is actually in that complaint, though, the basis for saying that his—my client is liable is the joining of a group, a political group.

"JUDGE GOODE: I understand your argument. I just think we see it very differently. I read the [TAC] several times now to try to understand what the thrust of it is, and I just think you're mischaracterizing the [TAC]."

At the conclusion of the argument, Judge Goode took 7 Stars' motion under submission, to be continued to November 16, when RPG's anti-SLAPP motion was set.

On December 27, Judge Goode filed his order that denied 7 Stars' anti-SLAPP motion in its entirety. Doing so, Judge Goode noted as follows: "In their moving memorandum, 7 Stars and Handoush failed to provide legal authorities to show that a large number of allegations identified in this motion were protected activity. Some of the allegations identified by these defendants could well be protected activity, but defendants were tasked with presenting facts and law to show how the allegations were protected activity. In the moving papers, defendants did not adequately complete this task. Defendants cite many additional authorities in their reply, however, the Court will not consider legal authorities first cited in the reply that could have been cited in the moving papers. In addition, with few exceptions, the alleged conduct is incidental to RCCC's Cartwright Act claim and 7 Stars and Handoush have not shown otherwise. Therefore, 7 Stars and Handoush have not shifted the burden and this motion is denied."[1]

On January 4, 2018, 7 Stars filed a notice of appeal.

## DISCUSSION

### Anti-SLAPP Law and the Standard of Review

We have many times set forth the operation of the anti-SLAPP law, illustrated by our exposition in *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 463–464:

---

[1] That same day, Judge Goode issued a comprehensive order addressing RPG's motion, concluding that it was "granted in part and denied in part," going on to strike paragraphs 37, 38, 54, 55, 56, 58 and 62 of the Third Amended Complaint.

8

"Subdivision (b)(1) of section 425.16 provides that '[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.' Subdivision (e) of section 425.16 elaborates the four types of acts within the ambit of a SLAPP, including, as pertinent here, '(4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.'

"A two-step process is used for determining whether an action is a SLAPP. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity, that is, by demonstrating that the facts underlying the plaintiff's complaint fit one of the categories spelled out in section 425.16, subdivision (e). If the court finds that such a showing has been made, it must then determine the second step, whether the plaintiff has demonstrated a probability of prevailing on the claim. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).) [¶] . . . [¶]

"Finally, and as subdivision (a) of section 425.16 expressly mandates, the section 'shall be construed broadly.'

"With these principles in mind, we turn to a review of the issues before us, a review that is de novo. (*Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 988 (*Grewal*).)"

**The Third Amended Complaint Is Not Based on Protected Activity**

As we have put it, "In order for a complaint to be within the anti-SLAPP statute, the 'critical consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity.' (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.) To make that determination, we look to the 'principal thrust or gravamen of the plaintiff's cause of action.' (*Martinez v. Metabolife International, Inc.* (2003)

9

113 Cal.App.4th 181, 188, italics omitted; see *Dyer v. Childress* (2007) 147 Cal.App.4th 1273, 1279.)" (*Moriarty, supra,* 224 Cal.App.4th at pp. 133–134.)

Our Supreme Court has recently put it this way: "A claim arises from protected activity when that activity underlies or forms the basis for the claim. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78; *Equilon Enterprises v. Consumer Cause, Inc.* [(2002)] 29 Cal.4th [53,] 66; *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1114.)" (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1063 (*Park*).)

"Critically, 'the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.' [Citation.] . . . ]he focus is on determining what 'the defendant's activity [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.' [Citation.] 'The only means specified in section 425.16 by which a moving defendant can satisfy the ["arising from"] requirement is to demonstrate that *the defendant's conduct by which plaintiff claims to have been injured* falls within one of the four categories described in subdivision (e) . . . .' [Citation.] In short, in ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Park, supra,* 2 Cal.5th at p. 1063.)

Finally, we accept as true RCCC's pleaded facts. (*Young v. Tri-City Healthcare Dist.* (2012) 210 Cal.App.4th 35, 54; see *Freeman v. Schack* (2007) 154 Cal.App.4th 719, 733.)

As shown above, on several occasions, in no uncertain terms, Judge Goode accused 7 Stars' attorney of mischaracterizing the TAC, of not reading it "fair[ly]." Against that background, 7 Stars comes before this court with a 55-page brief, citing 60 cases and 16 statutes, that is frankly nothing but more of the same—making arguments based on a reading of the complaint that was utterly rejected by Judge Goode. Sure it's de novo review. But right is right. And it's not right to continue to misrepresent "the gravamen," the thrust, of RCCC's cause of action.

10

RCCC's respondent's brief calls 7 Stars on this, in an argument that begins as follows:

"A.  Appellants Misrepresent The Facts As Alleged in the [TAC] and The Supporting Hirschhorn Declaration[.]  [¶]  As in the trial court, as pointed out by Judge Goode, Appellants completely mischaracterize the record, for the most part ignoring the Declaration of Lisa Hirschhorn, whose sworn facts undergird the [TAC].  This Court cannot not accept Appellants' mischaracterization of the facts alleged in the [TAC] and the supporting evidence.  Appellants have an obligation to accurately and fairly present the critical facts but failed to do so.  See *Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1531."

7 Stars' reply brief barely acknowledges this criticism, responding this way:

"Plaintiff asserts Appellants 'mischaracterize the record.' . . .  Plaintiff does not identify any mischaracterized or uncited fact."  And, 7 Stars goes on, "The Opening Brief presents the facts in the context of the relevant standard of review, with citations to the record.  Review is de novo and a 'defendant need only make a prima facie showing that plaintiff's claims arise from defendant's constitutionally protected free speech or petition rights.'  (*Optional Capital, Inc. v. Akin Gump Strauss, Hauer & Feld LLP* (2017) 18 Cal.App.5th 95.)  On the first step, it is Defendants' evidence that must be given consideration."  We could not disagree more.

Beyond that, 7 Stars goes on to at length with its representation—more accurately, misrepresentation—of what the TAC is about, going so far at one point to assert that Hirschhorn's declaration "includes vague statements that 'our group' took some action, but does not directly contradict the specific statements of Mr. Handoush.  Plaintiff's failure to plainly refute Mr. Handoush implies evasion of the issue.  (*Vogel v. Felice* (2005) 127 Cal.App.4th 1006, 1022 and fn. 5.)"

This, of course, is directly contrary to Hirschhorn's testimony—and directly contrary to appropriate advocacy in an anti-SLAPP setting.

In *Moriarty, supra*, 224 Cal.App.4th 125, we easily rejected an appeal by a losing defendant in an anti-SLAPP case, an opinion that among other things criticized

11

defendant's counsel for his myopic reading of the complaint, describing such conduct as a "selective reading" of the complaint that was "inappropriate." (*Id*. at p. 135.) Likewise here.

Moriarty also cited and distilled several cases where, like here, the complaint included what was protected activity, but which protected activity was "only incidental to the thrust of the complaint." (*Moriarty, supra*, 224 Cal.App.4th at p. 140.) Indeed—and identical to the situation here—one of those cases involved activity by defendants pertaining to permits. Even so, it was not a SLAPP. We described that case this way: "*Wang v. Wal-Mart Real Estate Business Trust* (2007) 153 Cal.App.4th 790, where a seller of real property brought an action against the buyer, the city, and city officials for breach of contract, fraud, and related causes of action, in which some of the actions complained of related to defendants' conduct in obtaining and issuing permits. Held: the thrust of the action did not 'arise' from these activities. (*Id*. at p. 799.)" (*Moriarty*, at p. 140.)

*Moriarty* has been cited and quoted many times since 2014, in both published and unpublished opinions. Our most recent reference to *Moriarty* was this year, in *Central Valley Hospitalists v. Dignity Health* (2018) 19 Cal.App.5th 203. This, too, was a case where defendant's counsel filed an anti-SLAPP motion based on a reading of the complaint that was markedly off base. Another experienced trial judge described defendant's motion as an "aggressive one," (*id.* at p. 211) and denied it. Again, we easily affirmed.[2]

*Moriarty* and *Central Valley Hospitalists v. Dignity Health* may be said to be on point here. They are at least persuasive. They are ignored by 7 Stars.

The gravamen of RCCC's Cartwright Act claim is set forth at length, and in detail, in the TAC, a complaint whose factual allegations are based on Hirschhorn's declaration.

---

[2] Not only that, we on our own motion raised the issue of sanctions, on the basis that it appeared the appeal was taken for purposes of delay, ultimately not imposing them because it did not appear that the defendant hospital was the responsible party and plaintiff doctors group did not pursue them.

12

We need not repeat all that here, but suffice to repeat her introductory paragraph: that from 2011 through 2015 the group, "declared war on RCCC. We conspired to prevent RCCC from getting any property in Richmond. We discussed and presented leases, letters of intent to lease or purchase, and purchase agreements—all of which were bogus. The intent of these phony real estate deals or leases, which were presented to landlords was to 'tie them up with paper.' " As Hirschhorn went on to describe, in pursuit of that conspiracy "the group" employed various tactics to block RCCC from buying or leasing conforming properties in Richmond, all for the explicit purpose of preventing RCCC from acquiring a business location until enough time passed so that its permit would expire and become void, and the three dispensary defendants would control the lucrative medical marijuana market in Richmond.[3]

The essence of RCCC's TAC was the private actions the group took to restrain trade and monopolize the medical marijuana market in Richmond. That was the gravamen, the thrust, of the cause of action. Whatever the protected activity, it was at the most incidental. (*Martinez v. Metabolife International, Inc.*, *supra,* 113 Cal.App.4th at pp. 187–188; *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 672–673.)

---

[3] Lucrative indeed. RPG was on track to earn $3.5 to $4 million in sales; 7 Stars on track to earn $2.5 to $2.7 million; and HHC on track to earn $1.5 to $1.7 million.

## DISPOSITION

The order is affirmed.  RCCC shall recover its costs on appeal.

_____
Richman, Acting P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.

A153305; *Richmond Compassionate Care v. 7 Stars Holistic*

15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RICHMOND COMPASSIONATE CARE COLLECTIVE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>7 STARS HOLISTIC FOUNDATION, INC., et al.,<br><br>    Defendants and Appellants;<br><br>HOLISTIC HEALING COLLECTIVE, INC., et al.,<br><br>    Defendants. | A153305<br><br>(Contra Costa County<br>Super. Ct. No. MSC1601426)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING, CERTIFYING OPINION FOR PUBLICATION**<br>**[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

The opinion filed herein on January 29, 2019, is modified as follows:

On page 3, line two is modified to read

> marijuana facility is a public issue." And, he concluded, the allegations "related to

This modification does not effect a change in the judgment. The petition for rehearing is denied.

The opinion filed herein on January 29, 2019, was not certified for publication. Good cause appearing, the Reporter of Decisions is directed to publish the opinion as modified.

Dated:                         _____ Acting P.J.

Trial Court: Contra Costa County Superior Court

Trial Judge: Honorable Barry P. Goode

Attorney for Plaintiff and Respondent Richmond Compassionate Care Collective: Foreman & Brasso, Ronald D. Foreman;

Attorney for Defendants and Appellants 7 Stars Holistic Foundation, Inc.; Zeaad Handoush: Losch & Erlich, Joseph J. Erlich, Mark Meyer.