Filed 10/16/20  Jain Irrigation, Inc. v. Netafim Irrigation, Inc. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JAIN IRRIGATION, INC. et al.,<br><br>    Plaintiffs and Respondents,<br><br>    v.<br><br>NETAFIM IRRIGATION, INC.,<br><br>    Defendant and Appellant. | D076633<br><br><br>(Super. Ct. No. 37-2019-00035422-CU-AT-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Best Best & Krieger, Kendall H. MacVey, Gregg W. Kettles, and Wendy Y. Wang for Defendant and Appellant.

Sheppard, Mullin, Richter & Hampton, Michael W. Scarborough, Dylan I. Ballard, Helen Eckert, and Joy O. Siu for Plaintiffs and Respondents.

Jain Irrigation, Inc. (Jain) and Netafim Irrigation, Inc. (Netafim) are competitor manufacturers.  Jain and related entities filed a lawsuit against Netafim and another manufacturer alleging these defendants conspired to retaliate against Jain for Jain's purchase of an ownership interest in two

downstream firms.  Plaintiffs alleged the retaliation took the form of two group boycotts that caused them economic harm.

Netafim moved to strike the complaint under the anti-SLAPP statute, arguing the claims arose from its issuance of a press release.  (Code Civ. Proc., § 425.16.)[1]  The court found the claims did not arise from the press release, and denied the motion.  Netafim appeals.  We agree with the trial court and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Summary of Complaint's Allegations*

Jain and Netafim each manufacture micro-irrigation products.  Micro-irrigation is a type of irrigation that delivers low-water volumes to the root systems of growing plants.  As compared to traditional irrigation, it provides a more efficient water delivery system, and has become crucial to growers in Central California.

Micro-irrigation manufacturers provide product components for the irrigation systems, such as pumps, filters, valves, and sensors. Manufacturers sell these products to dealers (labeled Design Firms in the complaint).  The Design Firms do not merely distribute the components to the end users (growers); they are also involved in engineering, designing, constructing, installing, and servicing micro-irrigation systems consistent with the particular grower's needs and specifications.

Central California growers generally purchase micro-irrigation systems from Design Firms through a competitive bidding process in which the grower's bid request will often identify the brand manufacturers to be used in the system.  Sometimes the grower will designate all parts to be from a single

---

[1]     All unspecified statutory references are to the Code of Civil Procedure.

manufacturer, and other times it will identify parts from different manufacturers.

Before April 2017, micro-irrigation manufacturers and Design Firms were separate entities. In April 2017, Jain formed an entity that acquired a majority interest in two Design Firms (Agri-Valley Irrigation, LLC (AVI) and Irrigation Design & Construction, LLC (IDC)). Under the acquisition agreement, AVI and IDC were permitted to continue serving as authorized dealers for Jain and other manufacturers.

Shortly after Jain's public announcement of this merger, Netafim allegedly began contacting competitors asking them to join Netafim in a boycott of Jain (and AVI and IDC) to punish Jain for this first-time vertical integration in the industry. Several manufacturers allegedly agreed to participate in the boycott, including codefendant Rivulis Irrigation, Inc. (Rivulis). Plaintiffs alleged they had direct evidence of the agreement, including statements by other manufacturer employees that Netafim was the " 'ringleader' " of this horizontal boycott. As described in more detail below, plaintiffs also alleged that Netafim issued a press release stating it would no longer do business with AVI or IDC, and that this press release was "key to the successful formation and implementation of the group boycott."

The alleged resulting boycott agreement among the micro-irrigation manufacturers took two forms. First, the manufacturers allegedly agreed to immediately refuse to supply their micro-irrigation products to AVI and IDC, despite knowing that AVI and IDC would need access to these products to successfully bid for irrigation projects. Second, the manufacturers agreed to "wield their collectively dominant market power" to coerce the other Design Firms to participate in a group boycott by compelling these firms to take various actions, including refusing to (1) purchase micro-irrigation products

3

from Jain or include any Jain products in their project bids to growers; and (2) sell any of their products to AVI and IDC through what is known in the industry as a " 'two-step' transaction." Plaintiffs alleged these manufacturers presented the Design Firms "with an ultimatum: either agree to boycott Plaintiffs or be cut off from receiving the . . . [m]anufacturers' essential products."

*Lawsuit*

In July 2019, Jain, AVI, IDC, and the Jain entity holding the AVI and IDC interests, sued Netafim and Rivulis, alleging four causes of action: (1) two causes of action for violation of California's Cartwright Act (Bus. & Prof. Code, § 16720); (2) intentional interference with prospective economic advantage; and (3) violation of California's unfair competition law (UCL) (Bus. & Prof. Code, § 17200).

Each cause of action was based on the assertion that the alleged boycott agreements, and alleged implementation of the agreements, were unlawful and wrongful. Plaintiffs' detailed complaint (158 paragraphs) identified numerous alleged facts supporting the existence of the alleged boycott agreements, including direct statements, inferences from actions, and Netafim's press release signaling to others its firm commitment not to do business with Jain or its related entities.

In the Cartwright Act claims, plaintiffs alleged that in or about April 2017, defendants and other "Conspiring Manufacturers" organized, entered into, and carried out an illegal combination and conspiracy "for the purpose of hurting" their competitor, Jain, through refusing to sell any of their products to AVI and IDC and/or pressuring other Design Firms not to do business with Jain, AVI or IDC.

4

Plaintiffs alleged they suffered injury "as a result of" this "horizontal conspiracy." Specifically, plaintiffs alleged the boycott prevented Jain from "successfully selling its products" and "vertically integrating with AVI and IDC." Plaintiffs further alleged the boycott "substantially reduc[ed] the value of" Jain "by eliminating the increased value of AVI and IDC as a combined operation. . . ." Plaintiffs alleged that "[a]s a result of the combination and conspiracy . . . , growers in Central California enjoy fewer competitive choices . . . and higher prices . . . . Thus, through their collusive actions, Defendants and their co-conspirators have illegally restrained trade or commerce in violation of the Cartwright Act."

Both the intentional interference and UCL claims were based on allegations that defendants violated the Cartwright Act by agreeing to, and engaging in, the boycotts.

*Anti-SLAPP Motion*

Netafim moved to dismiss the claims under the anti-SLAPP statute. Netafim argued each of the claims arose from its issuance of its press release, which it said was widely distributed on public forums, and concerned issues of public interest involving the role of micro-irrigation in Central California and the dangers posed by vertical mergers in the industry. It further argued plaintiffs would be unable to establish a likelihood of success on the merits of their claims.

In support of its argument that plaintiffs' claims were subject to the anti-SLAPP statute, Netafim relied on Paragraphs 86 and 87 of plaintiffs' complaint discussing Netafim's press release. In these paragraphs, plaintiffs alleged: "At the same time that Netafim was contacting [its] competitors to persuade them to 'join [Netafim] in cutting off' AVI and IDC so as to punish Jain, Netafim publicly announced [in a press release sent] to the industry

5

that it had immediately terminated AVI's and IDC's status as authorized dealers of Netafim's Micro-Irrigation Products."  Plaintiffs further alleged: "Netafim's public, unequivocal and irrevocable declaration of its refusal to continue doing business with AVI and IDC was key to the successful formation and implementation of the group boycott. . . .  The only plausible reason for Netafim to publicly broadcast its decision to terminate AVI and IDC was to encourage and establish a pretextual justification for other [manufacturers] to follow suit, and signal Netafim's . . . commitment to the horizontal boycott. . . .  Netafim also used the announcement to begin paving the way for the manufacturers' conspiracy to pressure and persuade dealers to assist with the overall effort to punish Jain."

Netafim also submitted copies of the April 2017 press releases issued by Jain and Netafim.

Jain's press release announced its merger with AVI and IDC, which it said were two of the "United States' largest" micro-irrigation dealers.  The press release said the new "entity will provide a unique platform to help growers implement state-of-the-art irrigation technology and achieve more crop per drop."  Quoting Jain's CEO, the press release also said: " 'We are delighted to be able to finance and participate in such an industry changing and strategic partnership.  The transaction gives us the capability to provide grower focused, turn-key, end-to-end project solutions, consistent with our global solutions and capabilities.' "

Netafim's press release (issued five days after Jain's press release) announced that IDC and AVI "will no longer be recognized as authorized distributors" for Netafim.  The press release said: "[t]he decision to revoke IDC's and AVI's status as Netafim['s] authorized dealers is a direct result of [Jain's] announcement that the two firms have entered into an agreement to

6

merge their business under a newly formed distribution company, owned . . . by [Jain]." The release also said:

> " 'We terminated our relationship with IDC and AVI to demonstrate our strong support for the independent dealers, ultimately for the benefit of California's growers . . . . We see this arrangement to be in direct conflict with our policy of maintaining independent, full service dealer-partners that lead with our products, and who share our philosophy of providing growers with the best possible irrigation solutions. We have been consistent that the North American market is best served . . . [through] a collaboration model . . . and we see the value and innovation . . . eroding in a model where one entity controls both functions.' "

Netafim also produced the declaration of its marketing director, who said the two press releases were issued on PR Newswire, which "reaches thousands of websites and journalists . . . ." He further stated:

> "Jain's acquisition and merger threatened to change the role of distributors. It risked creating a conflict-of-interest in the supply chain to the detriment to the growers . . . . [¶] To respond publicly to Jain's Press Release . . . and highlight the risks it posed to the micro-irrigation market and growers, . . . [Netafim made] clear [it] would not support any effort to change the role of independent distributors in the market and the public announcement of [this] decision . . . was intended to demonstrate its commitment to that principle."

Netafim also asked the court to take judicial notice of numerous documents which it said supported its contentions that its press release concerned a matter of public interest and that plaintiffs' antitrust claims have no merit.

*Opposition to Anti-SLAPP Motion*

Plaintiffs responded that the anti-SLAPP statute was inapplicable because their claims arose from the "two . . . *antitrust conspiracies*," and not

7

from Netafim's press release.  Plaintiffs argued "the factual allegations . . . include repeated conspiratorial meetings and communications, efforts to intimidate other market participants into cooperating, and direct admissions that the conspiracies existed.  Netafim ignores virtually all of these allegations, and instead cherry-picks two paragraphs from Plaintiffs' 158-paragraph Complaint—which refer to a single Netafim press release as one of many acts in support of the conspiracies . . . ." (Boldface and italics omitted.)

Plaintiffs alternatively argued: (1) the press release did not constitute protected activity because Netafim's statements did not concern an issue of public interest (§ 425.16, subd. (e)(3), (4)); and (2) the press release falls within anti-SLAPP's " 'commercial speech' " exception (§ 425.17, subd. (c)(1)). Plaintiffs also maintained that even if the anti-SLAPP applied, their claims have at least minimal merit, and submitted the supporting declaration of Jain's executive vice-president, who discussed facts pertaining to Netafim's role in the alleged boycotts.

Plaintiffs sought costs and attorney fees based on their claim Netafim's anti-SLAPP motion was frivolous.  (See § 425.16, subd. (c)(1).)

*Reply*

On the probability-of-prevailing issue, Netafim argued the executive vice-president's declaration was inadmissible because his statements were based largely on hearsay.  Netafim also filed a separate motion asserting numerous evidentiary objections to the declaration.

*Court's Ruling*

After a hearing, the court denied the anti-SLAPP motion, finding the press release "is not the real thrust of the case."  In its written ruling, the court reiterated that "[t]he allegations are not within the purview of [section] 425.16."  Based on this finding, the court did not reach the probability-of-

8

prevailing issues, or rule on Netafim's evidentiary objections pertaining only to those issues. The court declined to award attorney fees as sanctions, finding the motion was not "totally and completely without merit."

DISCUSSION

I. *Legal Principles*

California's anti-SLAPP statute "provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) "Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by [the statute]. [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Ibid.*) We review de novo a court's rulings on whether the parties met their respective burdens. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.)

Under the first step of the anti-SLAPP analysis, the moving party must show (1) the complaint alleges protected speech or conduct, *and* (2) the "relief is sought based on allegations *arising from*" the protected activity. (*Baral, supra*, 1 Cal.5th at p. 396, italics added; accord *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061-1063 (*Park*).)

The statute defines four categories of protected activities. (§ 425.16, subd. (e).) In the proceedings below, Netafim maintained that plaintiffs' claims concerned matters of public interest and thus fell under section 425.16, subdivision (e)(3) or (4). On appeal, Netafim reasserts these arguments. However, before reaching this issue, we address the foundational question whether plaintiffs' claims *arose from* this asserted protected activity. (See *Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 885 (*Wilson*).

9

If the claims did not arise from the alleged protected activity, the anti-SLAPP statute does not apply. (*Ibid.; Park, supra,* 2 Cal.5th at pp.1060-1061, 1062-1067.)

On the "arising from" requirement, the defendant must show "the defendant's act underlying the plaintiff's cause of action [was] *itself*" a protected act. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 (*City of Cotati*); accord *Wilson, supra,* 7 Cal.5th at p. 884; *Park, supra,* 2 Cal.5th at p. 1060.) " '[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute.' [Citations.] Instead, the focus is on determining what 'the defendant's *activity* [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.' " (*Park,* at p. 1063, italics added; *Gaynor v. Baral* (2018) 19 Cal.App.5th 864, 877-878.)

In considering whether this test is met, a court must identify the alleged injury-producing act that formed the basis for the claim. (*Park*, *supra*, 2 Cal.5th at pp. 1062-1063.) " 'The only means specified in section 425.16 by which a moving defendant can satisfy the ["arising from"] requirement is to demonstrate that *the defendant's conduct by which plaintiff claims to have been injured* falls within one of the four categories described in subdivision (e). . . .' " (*Id.* at p. 1063.) "[C]ourts must 'consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.' " (*Wilson,* 7 Cal.5th at p. 884.) In so doing, the courts should be "attuned to and . . . respect the distinction between activities that form the basis for a claim and those that *merely lead to the liability-creating activity or provide evidentiary support for the claim.*" (*Park,* at p. 1064, italics added.)

10

Applying these principles to conspiracy claims, the courts have found the anti-SLAPP statute inapplicable when the asserted protected activities are the statements or conduct leading to the alleged unlawful agreement. (See, e.g., *Spencer v. Mowat* (2020) 46 Cal.App.5th 1024, 1037 ["When liability is asserted for the target act of a conspiracy, the preliminary speech or petitioning activity is simply evidence of the defendants liability, not the 'wrong complained of' "]; *Richmond Compassionate Care Collective v. 7 Stars Holistic Foundation, Inc.* (2019) 32 Cal.App.5th 458, 470 (*Richmond*) [gravamen was antitrust conspiracy, not statements made and actions taken in furtherance of conspiracy].)

## II. *Analysis*

The elements of plaintiffs' Cartwright Act claims are " ' "(1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts. [Citations.]" ' " (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 47 (*Quelimane*); *Marsh v. Anesthesia Services Medical Group, Inc.* (2011) 200 Cal.App.4th 480, 493.)  The remaining two claims (intentional interference and the UCL violation) are based on proof of the Cartwright Act claims.

Plaintiffs pled the Cartwright Act elements by alleging the existence of *an agreement* among Jain's competitors to refuse to supply their products to AVI and IDC and to pressure the other Design Firms not to purchase from Jain or transact business with AVI and IDC; defendants' implementation of the agreements; and plaintiffs' economic harm suffered because of the actions.  Plaintiffs claimed *these alleged agreements and boycotts* violated state antitrust laws and caused harm to their economic interests.

11

Under these allegations, the trial court correctly found the alleged boycott agreements and implementation of these agreements formed the basis for the elements of the causes of action, and not Netafim's press release. Plaintiffs did not allege that issuing the press release was itself an antitrust violation. Instead, the wrong complained of was that Netafim and the "Conspiring Manufacturers" unlawfully agreed to boycott plaintiffs' businesses. (See *Quelimane, supra,* 19 Cal.4th at pp. 48-50 [while refusing to sell a product to a consumer does not itself violate Cartwright Act, when the refusal results from a combination, agreement, or conspiracy to make the product unavailable in a given market, a prohibited restraint of trade may be found]; see also *In re Automobile Antitrust Cases I and II* (2016) 1 Cal.App.5th 127, 160-161.)

Netafim's issuance of its press release provided evidence of how Netafim first informed others of its alleged boycott plan and of its firm commitment to this plan. But it was not the press release that was allegedly unlawful. The press release did not trigger anti-SLAPP protection because it was merely the conduct that led "to the [alleged] liability-creating activity" and "provided evidentiary support" for plaintiffs' claims. (*Park, supra*, 2 Cal.5th at p. 1064; see *Area 51 Productions, Inc. v. City of Alameda* (2018) 20 Cal.App.5th 581, 596.) Plaintiffs did not claim they were injured by the press release, nor did they claim that the press release was the wrongful conduct that formed the basis of their claims. It was the boycott agreements that caused plaintiffs alleged harm, not the press release.

In its appellate briefs, Netafim focuses on plaintiffs' allegation that the press release "was *key* to the successful formation and implementation of the group boycott." (Italics added.) Viewed in context, the word "key" did not mean the press release was the basis for plaintiffs' antitrust claims. As

framed, this allegation described an important step in Netafim's creation and formation of the allegedly unlawful boycott (by communicating and making clear to its competitors its firm commitment not to deal with AVI or IDC). But this allegation cannot be fairly interpreted to mean the press release formed a necessary predicate for the elements of plaintiffs' claims. Even without the allegation, plaintiffs' claims would stand. (See *Park, supra,* 2 Cal.5th at p. 1068 [claim did not arise from protected activity if " '[p]laintiff could have omitted allegations [of the protected conduct] and still state the same claims' "]; see also *Richmond, supra,* 32 Cal.App.5th at p. 469 [anti-SLAPP analysis should not be based on a "myopic" or "selective reading" of the complaint].)

For similar reasons, we find unavailing Netafim's discussion of plaintiffs' assertions that the group boycott was "instigated by Netafim's issuance of its press release." As our high court said almost two decades ago, it is not enough that an action was filed after protected activity or that it was taken in response to that protected activity. (*City of Cotati*, *supra*, 29 Cal.4th at pp. 76-77.) The fact that a protected activity may have triggered the wrongful conduct "does not necessarily mean that the causes of action *arose from* the protected activity." (*Third Laguna Hills Mutual v. Joslin* (2020) 49 Cal.App.5th 366, 373.)

Netafim contends the crux of the dispute was "a case of dueling press releases," and that plaintiffs are "punishing" Netafim for exercising its First Amendment rights to respond to Jain's press release. This contention is unsupported. Plaintiffs' complaint does not challenge Netafim's right to issue a press release, nor are plaintiffs' legal claims grounded on conflicting information in the press releases. Plaintiffs do not allege, for example, that any information in Netafim's press release was independently actionable.

13

Rather, plaintiffs allege Netafim's press release was evidence to show one way in which Netafim communicated with other competitors to reflect its desire to engage in a boycott. The fact that alleged protected statements supply evidence to support the claim "does not convert the statements themselves into the basis for liability." (*Park, supra,* 2 Cal.5th at p. 1068.)

We also find unavailing Netafim's argument that the press release must be the "gravamen" of the claims because it "is the only admissible evidence plaintiffs have to support their alleged conspiracy." The argument has no place in the first step of the anti-SLAPP analysis. Plaintiffs had no burden to come forward with evidence if their claims were not protected by the anti-SLAPP statute. Thus, the nature of plaintiffs' admissible evidence to support their claims is not before us (or the trial court) at this stage of the proceedings.

Based on our finding that plaintiffs' claims did not *arise from* the claimed protected activity, we do not reach the parties' alternate arguments regarding whether the press release concerned an issue of public interest; whether the claims fell within the comparative advertising exception (§ 425.17, subd. (c)(1)); and/or whether plaintiffs established a probability of prevailing. On the latter issue, we emphasize that nothing we have said in this opinion should be interpreted as expressing views on the merits of the allegations; those issues are not before us.

We deny plaintiffs' request for judicial notice. As those documents pertain primarily to the probability-of-prevailing element, they are not helpful to our resolution of this appeal.

14

### III. *Attorney Fees*

Plaintiffs request attorney fees for Netafim's filing a frivolous appeal. (§ 425.16, subd. (c)(1).)  We deny this request as we find the appeal was not frivolous under applicable standards.

### DISPOSITION

Order affirmed.  Appellant to bear respondents' costs on appeal.


HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


DATO, J.

15