Filed 9/17/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| OAKLAND BULK AND OVERSIZED TERMINAL, LLC, et al.,<br><br>　　　Plaintiffs and Respondents,<br><br>v.<br><br>CITY OF OAKLAND,<br><br>　　　Defendant and Appellant. | A157330<br><br>(Alameda County Super. Ct. No. RG18930929) |

The City of Oakland (City) entered into a series of agreements with Oakland Bulk and Oversized Terminal, LLC (OBOT) for the development of the land at the site of the former Oakland Army Base. It was to be a huge project, to include a bulk commodity shipping terminal for transfer of commodities, including coal, to foreign countries. When the subject of coal became public, it activated interest groups, ultimately leading to a City ordinance banning coal handling and storage in the City and a resolution applying the ordinance to the terminal. OBOT filed suit in federal court, which ruled for OBOT, holding that the resolution was a breach of the City's agreement with OBOT, and enjoining the City from relying on the resolution. Despite that ruling, friction between OBOT and the City continued.

OBOT (along with an affiliate) filed suit against the City, alleging 12 causes of action, including three for breach of contract and seven for tort.

1

The City filed a demurrer and a standard motion to strike, followed weeks later by a special motion to strike (SLAPP motion) that sought to strike "in part" the complaint—a motion that thus recognized the case would proceed. The court advanced the SLAPP motion so it came on for hearing with the other two matters, which hearing began with the court making early mention of the SLAPP motion, observing that it "might be premature." The hearing dealt primarily with the demurrer, which the trial court had addressed in a tentative ruling, overruling it in most part, and sustaining it in part with leave to amend. Days later, the trial court entered an order on the SLAPP motion, that it was "denied without prejudice," going on to describe it as "premature" in light of the amended complaint to come. The City did not wait for the amended complaint, and appealed.

The City's appeal argues at length that the trial court erred in allowing amendment, but then goes on to ask us to decide the SLAPP motion. We do that, and decide that it has no merit, that plaintiffs' complaint is not based on protected activity. We thus remand with instructions to the trial court to enter an order denying the SLAPP motion, with some observations about the state of anti-SLAPP law in those instances where the case will proceed—and whether something should be done about it.

BACKGROUND

**The General Setting and the Agreements**

Beginning in 2010, the City entered into the first of a series of agreements with OBOT governing the development of the land at the site of the former Oakland Army Base in general, and in particular the "West Gateway" portion of the base. The purpose was to build a bulk commodity shipping terminal and associated railway improvements (terminal), which was envisioned as a facility for unloading bulk goods from railcars and

transferring those goods onto ships for export to other countries. The agreements came to include a lease disposition and development agreement (LDDA), a development agreement (development agreement), and ultimately a ground lease (lease) under which OBOT ground-leased the West Gateway property and the existing rail right of way (rail R/O/W). Some pertinent terms of the documents will be described as appropriate below. Suffice to say here that the agreements granted OBOT the right to develop, build, and operate the terminal, according to specific required timeframes, on a parcel of land adjacent to San Francisco Bay called the West Gateway.

**The Ordinance and the Resolution**

As part of the development process—and in furtherance of its obligations under the agreements—OBOT began to search for a company to construct and operate the terminal, and in the spring of 2014 began negotiations with Terminal Logistics Solutions (TLS). The negotiations were successful, and in November 2014, OBOT entered into an exclusive negotiation agreement and sublease option (sublease option) under which TLS was granted an exclusive option to sublease and operate the terminal for 66 years.

According to OBOT, at all relevant times it communicated to the City the development plans for the West Gateway, and the City was aware that coal (and petcoke) were bulk commodities to be transported through the terminal. Indeed, OBOT asserts it would not have agreed to develop the project, committing tens of millions of dollars to do so, if coal were excluded from the commodities that could be shipped.

But whatever the City knew, in 2014, shortly after OBOT began negotiations with TLS, word spread that coal was one of the commodities to be handled at the terminal. This in turn generated significant public

3

concern, and interest groups began focusing on the matter. This led to a June 2014 resolution expressing the City's general opposition to transporting fossil fuels through the City, and ultimately to the 2016 enactment of an ordinance banning coal handling and storage in the City (ordinance) and a resolution applying the ordinance to the terminal (resolution).[1]

**The Federal Action**

In December 2016, OBOT filed a lawsuit in federal court: *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland* (N.D. Cal. 2018) 321 F.Supp.3d 986 (federal action). The federal action asserted that the City breached the development agreement by applying the coal ban to the terminal. Following a court trial, on May 15, 2018, the district court judge issued his findings of fact and conclusions, framing the question at issue as "whether the record before the City Council when it made this decision [adopting the resolution] contained substantial evidence that the proposed coal operations would pose a substantial health or safety danger." And he answered "no," holding as follows: "Even under the deferential standard of review in the development agreement, the record before the City Council does not contain enough evidence to support the City Council's conclusion that the proposed coal operations would pose a substantial danger to the people in Oakland. In fact, the record is riddled with inaccuracies, major evidentiary

---

[1] Concerning this, the city claimed it was acting in response to concerns regarding health, safety, and environmental impacts of coal shipping and based on scientific evidence presented to the city council regarding serious health risks posed by coal. And its position was that the resolution was the result of a nearly year-long public hearing process, following which the city council determined that banning the handling and shipping of coal at the terminal was necessary to protect Oakland residents from coal-related harm, particularly the residents of the immediately neighboring, low-income West Oakland community, which had long suffered disproportionate adverse environmental impacts from port activity.

4

gaps, erroneous assumptions, and faulty analyses, to the point that no reliable conclusion about health or safety dangers could be drawn from it. Perhaps a more thorough investigation could result in a lawful determination that coal operations may be restricted at the facility, but in this case, the record was inadequate. Because the resolution adopted by the City Council applying the coal Ordinance to this shipping facility constitutes a breach of the development agreement, it is invalid, and the City may not rely on it to restrict operations there." (*Id.* at pp. 988–989.)

In light of the above, the district court held that "The City is therefore enjoined from relying on the Resolution either to apply the Ordinance to OBOT or to restrict future coal operations at the facility. As a practical matter, this renders the coal Ordinance a nullity, because the only reason the City adopted it was to restrict OBOT's operations, and OBOT is the only facility in Oakland to which it could conceivably apply. But as a strictly technical matter, there's no reason to strike down the Ordinance once it has been determined that Oakland may not presently apply it to OBOT. The City remains free, of course, to pursue future regulation of the project so long as it complies with its legal obligations, including any legitimate contractual obligations to the project developers. Because OBOT prevails on its breach of contract claim, the Court enters judgment for OBOT without reaching the constitutional and statutory claims raised at summary judgment." (*Oakland Bulk & Oversized Terminal, LLC v. City of Oakland, supra,* 321 F.Supp.3d at pp. 1010–1011.)

5

On May 15, the district court entered judgment for OBOT, enjoining the City from applying the Ordinance to OBOT or restricting future coal operations to the terminal.[2]

Despite this ruling, the differences between the parties continued.

**The Default Claim**

The Lease defines "Force Majeure" as "events which result in delays in Party's performance of its obligations hereunder due to causes beyond such Party's control, including, but not restricted to, acts of God or of the public enemy, acts of the government, acts of the other Party, . . . and, in the case of Tenant, any delay resulting from a defect in Landlord's title to the Premises other than Permitted Exception. The delay caused by Force Majeure includes not only the period of time during which performance of an act is hindered, but also such additional time thereafter as may reasonably be required to complete performance of the hindered act."

On March 11, 2016, OBOT provided a notice of force majeure delay that was caused by the City's inability to inform OBOT of the construction codes and standards and applicable city regulations that apply to the premises and project improvements, as those terms are defined in the lease and the development agreement. The notice claimed the City admitted it was unable to provide the foundational information set forth in the applicable codes and standards and applicable regulations as required under section 3.4.4 of the development agreement, and OBOT was thus prevented from continuing work on the design of the project improvements.

---

[2] The City appealed the judgment, and in May 2020, the Ninth Circuit affirmed. (*Oakland Bulk & Oversized Terminal, LLC v. City of Oakland* (9th Cir. 2020) 960 F.3d 603.)

According to OBOT, due to the City's act of force majeure, OBOT was entitled to an extension of over two years of the commencement date as defined in the lease, with a further continuing extension for as long as the City failed to comply with its numerous obligations under the development agreement and the lease.

On April 10, 2018, OBOT submitted a second notice of force majeure delay, and thereafter reiterated its notice of such delay three more times in 2018, on July 30, August 3, and October 19.  The City did not respond to any of OBOT's notices.

Meanwhile, on August 20, the City sent a letter to OBOT claiming that it failed to commence construction of the project according to the lease timeline, and, blaming OBOT for the delay, claimed that it committed an "Unmatured Event of Default," which it demanded OBOT cure.

On September 21—and despite its failure to respond to OBOT's force majeure notices or to clarify that its August 20 letter was intended to be a rejection of OBOT's force majeure claim—the City sent OBOT a notice demanding that OBOT "cure" an "Unmatured Event of Default" for allegedly failing to meet minimum project obligations.  The notice went on to demand that OBOT pay liquidated damages on or before November 22.

On October 19, OBOT submitted a claim to the City pursuant to Government Code section 810 et seq., which included a claim for relief under the force majeure provisions of the lease.  The City failed to respond to OBOT's claim, and this lawsuit followed.

**The Proceedings Below**

On December 4, OBOT and Oakland Global Rail Enterprise (OGRE) filed suit against the City,[3] in a complaint that alleges 12 causes of action: breach of contract (first through third causes of action); fraud (fourth cause of action); intentional and negligent interference with contract and prospective economic advantage (fifth through tenth causes of action); declaratory relief (eleventh cause of action); and specific performance (twelfth cause of action). The complaint seeks compensatory damages, preliminary and permanent injunctions, attorney fees, and costs.

The complaint is 63 pages long (inclusive of three exhibits), and contains 237 paragraphs. After a few paragraphs setting forth the "Summary of Action," the complaint has 135 paragraphs of general charging allegations that allege numerous acts by the City—acts of delay, acts of interference, and various breaches of agreements—that caused damages that plaintiffs' brief asserts have already reached $27 million.

On December 5, the case was assigned for all purposes to the Honorable Jo-Lynne Q. Lee, a most experienced superior court judge.

**The Unlawful Detainer Action**

On December 11, a week after plaintiffs' complaint, the City filed a verified unlawful detainer complaint in Alameda County Superior Court seeking to evict plaintiffs and subtenant ITS. Two days later, without explanation, the City dismissed the unlawful detainer complaint without prejudice.

---

[3] OGRE alleged it is an affiliate of OBOT and entered into a sublease agreement with it with respect to the shoreline rail portion of the project.

**The City Responds to the Complaint**

On January 14, 2019, the City filed two pleadings, a demurrer and a motion to strike under Code of Civil Procedure section 436 (standard motion to strike), both set for hearing on April 30 (later advanced to April 25). The demurrer argued that res judicata barred plaintiffs' claims because they could have been brought in the federal action—including, however quizzically, claims that arose after judgment was entered in that action. The demurrer also argued that plaintiffs' tort claims were barred by the Government Claims Act and the applicable statutes of limitations, and, finally, that certain tort causes of action were insufficient to state claims. The motion to strike sought to strike numerous paragraphs in the complaint.

Then, on February 1, the City filed a special motion to strike pursuant to Code of Civil Procedure section 425.16, the SLAPP motion, set for hearing on May 14.[4] The SLAPP motion sought to strike "in part the complaint," asserting that plaintiffs' claims arise "in part" from what the City claimed was protected activity.

The SLAPP motion was accompanied by a 20-page memorandum of points and authorities. The first five pages were a table of contents and table of authorities, followed by a one-page introduction, and then a page of anti-SLAPP law boilerplate, including quotation of the four categories of protected activity in section 425.16, subdivision (e), italicizing two categories: (1) a statement or writing "made in connection with an issue under consideration or review by a legislative, executive or judicial body, or any other official proceeding authorized by law," and (2) "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of

---

[4] All unspecified references to a section or subdivisions of a section are to Code of Civil Procedure section 425.16.

9

free speech in connection with a public issue or an issue of public interest.[4]"[5] We assume the two italicized sections are the bases of the City's SLAPP motion, as the City never expressly says what is.

Following three more paragraphs of boilerplate, the memorandum argued that "plaintiffs' claims arise in part from the City's protected activity," beginning with this claimed five-line distillation of plaintiffs' complaint: "Plaintiffs allege the City breached its contractual obligations and committed torts by engaging in seven categories of wrongdoing; six are protected activity: (1) defending a lawsuit; (2) asserting a default; (3) interfering with funding; (4) interfering with rail; (5) interfering with permitting; and (6) other miscellaneous conduct." There followed a total of six pages of brief arguments purporting to address "the City's defense of a prior lawsuit between the parties" (one paragraph); "the City's assertion of a contractual default" (three paragraphs)[6]; "the City's interference with funding for the

---

[5] Footnote 4 in the memorandum said this: "A statement or other conduct is made 'in connection with a public issue or an issue of public interest' 'if the statement or conduct concerns a topic of widespread public interest and contributes in some manner to a public discussion of the topic.' (*Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 677–678 (citations omitted).) Plaintiffs cannot reasonably dispute that the City's statements and conduct relate to a public issue or an issue of public interest. Indeed, plaintiffs allege that their proposed shipment of coal 'generated significant public concern in Oakland' and the City 'yield[ed] to political pressure' from 'environmental and special interest group[s]' to 'the project's detriment.' [Citation.] Indeed, the project and the dispute between the parties have generated considerable press coverage. [Citation.]"

[6] In connection with this argument, the City relies heavily on *Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467 and *Birkner v. Lam* (2007) 156 Cal.App.4th 275, the former of which the City also relies on heavily here. Such reliance is misplaced. As the leading practice treatise describes it: "*Birkner* and *Feldman* have been criticized for failing to recognize that the critical consideration is whether the claim is *based on* defendant's protected free speech or petitioning activity. The mere fact that a

10

project" (two paragraphs); "the City's alleged interference with the rail portion of the project" (three paragraphs); "the City's alleged interference with permitting for the project" (three paragraphs); and "the City's other protected conduct related to the project" (one paragraph).

That was it. The City made no effort to address any of the individual causes of action, no effort to even refer to any of plaintiffs' seven tort claims.

All three of the City's pleadings were filed by the city attorney and the law firm of Lubin Olson & Niewiadomski, LLP.

Plaintiffs filed opposition to all three pleadings. As to the SLAPP motion, the opposition included four declarations, of: Megan Morodomi, the project manager for an investment group that was the sole member of OBOT, and also the managing member of OGRE; John Siegel, the founder and manager of ITS; Mark McClure, a partner and vice president of the investment company that was the sole member of OBOT, and also the president and managing member of OBOT; and Phillip Tagami, the president of the investment group and a managing member of OGRE. McClure's declaration attached and authenticated over 500 pages of material, Tagami's over 900 additional pages.

---

claim may have been *triggered* by protected activity (such as service of unlawful detainer papers) does not necessarily mean it *arose from* that activity. (*Ulkarim v. Westfield LLC* (2014) 227 Cal.App.4th [1266,] 1275– 1282 [finding it 'exceedingly difficult' to reconcile *Birkner* and *Feldman* with collected cases]; see also *Moriarty v. Laramar M*[*anagement*] *Corp.* [(2014)] 224 Cal.App.4th 125, 136–138] [distinguishing *Birkner* and *Feldman*]— terminating tenancy or wrongfully removing property from market under Ellis Act not protected activity . . ." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2019) ¶ 7:598, p. 7-11.)

On March 8, the City filed a substitution of attorneys and on March 15, another substitution, substituting in the firm of Altshuler Berzon LLP. And the Altshuler firm filed a reply memorandum.

Prior to the April 25 hearing, Judge Lee issued a comprehensive tentative ruling addressing both the demurrer and standard motion to strike. No tentative ruling was issued on the SLAPP motion which, as noted, was originally set for hearing on May 14.[7] As to the demurrer, the tentative ruling overruled it in part and sustained it in part with leave to amend. Judge Lee rejected the City's res judicata argument, concluding that the allegations in the complaint "concern distinct wrongs from those that pre-dated the federal action, and therefore are not barred by res judicata." She also rejected the statute of limitations defense as to the fraudulent inducement claim. Judge Lee tentatively sustained the demurrer with leave to amend the remaining tort claims, to specify the dates on which the City interfered with plaintiffs' economic relationships with potential subtenants, holding that "to the extent that discrete wrongs are alleged to have occurred within the statute of limitations for each claim, those claims may not be barred by the statute of limitations."

The matters came on for hearing on April 25. The hearing began with Judge Lee stating there were three matters on, but that her thinking was that the third matter, that is, the SLAPP motion, "might be premature." Shortly thereafter, she said, her inclination was to deny the SLAPP motion without prejudice or continue it, a position she noted three pages later in response to comment by counsel for the City. And the hearing ended with

---

[7] At oral argument counsel for the City represented that an informal order of March 4 set the SLAPP motion for April 25.

Judge Lee indicating she would take all the matters under submission, again observing that the SLAPP motion was premature.

On April 28, Judge Lee filed an order addressing the SLAPP motion, ruling that it was "denied without prejudice." Doing so, Judge Lee's order discussed SLAPP law in general, following which she concluded:

"Plaintiffs argue that this action is not based on any protected speech by Defendant, but arise from Defendant's breach of its contractual obligations and other legal duties. Specifically, Plaintiffs contend the claims arise from Defendant's obstruction of the development of the Terminal and the completion of the Project, including delay tactics and false public comments that interfered with Plaintiffs' relationships with lenders, other regulatory agencies, and prospective subtenants. Plaintiffs argue that Defendant also failed to perform material obligations under the Lease and Development Agreement between the parties, and prevented OBOT's performance. Plaintiffs contend that the purportedly protected activity led to Defendant's liability or is evidentiary support for Defendant's liability, but are not the basis themselves for Defendant's liability in this action.

"As to the second prong on the anti-SLAPP analysis, Defendant argues that Plaintiffs are unlikely to prevail on their claims based on many of the same arguments raised in Defendant's demurrer. The Court addresses those arguments in its ruling on the demurrer which was sustained in part and denied in part. Thus, the Court does not have the operative pleadings upon which to render a determination of the motion to strike and in particular, whether there is a potential for Plaintiffs to prevail on their claims.

"In light of the foregoing, the Court finds this motion premature given that the Court has given Plaintiffs leave to amend their complaint. It is

13

therefore DENIED without prejudice to a motion to strike some or all of the amended complaint to be filed."

On May 16, Judge Lee entered her formal orders on the demurrer and the standard motion to strike, consistent with the tentative ruling. The order on the demurrer rejected the City's arguments of res judicata and statute of limitations. And Judge Lee sustained the demurrer in part with leave to amend with additional specific facts to support plaintiffs' claims, ordering plaintiffs to file an amended complaint.

As to the standard motion to strike, Judge Lee granted it as to five paragraphs—66, 67, 87, 156, and 168—to the extent they include allegations that the City's enactment and defense of the ordinance and resolution form the basis of plaintiffs' claims for breach of contract. She denied the motion in all other respects.

Four days later, on May 20, the City filed its notice of appeal from the SLAPP order.[8]

## DISCUSSION

### Introduction

The parties devote a significant amount of briefing to the issue of whether any amendment was proper after the SLAPP motion was filed, the City arguing it was not and that Judge Lee committed error. We disagree.

To begin with, SLAPP law is silent as to the issue of amendment. (*Martin v. Inland Empire Utilities Agency* (2011) 198 Cal.App.4th 611, 629

---

[8] On June 6, consistent with Judge Lee's order, plaintiffs submitted a proposed first amended complaint, which addressed Judge Lee's rulings on the demurrer and standard motion to strike. However, the City's appeal prevented the filing of the amended complaint. In light of this, the City's argument based on what is, or is not, in the proposed amended complaint is inappropriate, and will not be considered.

14

(*Martin*); *Nguyen-Lam v. Cao* (2009) 171 Cal.App.4th 858, 871 (*Nguyen-Lam*).) In *Nguyen-Lam,* the trial court granted defendant's SLAPP motion, but granted plaintiff leave to amend, concluding that plaintiff submitted sufficient evidence to establish she would prevail on her claims. The Court of Appeal affirmed. After noting that the SLAPP statute is silent on amendment, the court held that the purpose of the anti-SLAPP statute is to unmask SLAPP actions masquerading as ordinary lawsuits and to resolve them expeditiously. (*Nguyen-Lam* at p. 871, citing *Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 927.) And that was not such a case.

Here, Judge Lee's tentative ruling on the City's demurrer rejected many of the City's defenses. In light of this, and the fact that the SLAPP motion acknowledged that it addressed only "in part" the complaint—not to mention the City's concession here that the complaint included non-protected conduct—it was clear that plaintiffs' case would proceed. Thus, it made perfect sense for Judge Lee to allow plaintiffs to amend their complaint and to defer a ruling on the SLAPP motion until "another motion" was forthcoming.[9] And, we hasten to add, proceeding in such fashion would

---

[9] Immediately following the April 25 hearing, Judge Lee held a case management conference, at which counsel for plaintiffs requested that Judge Lee set a trial date. She indicated she did not want to do so at the time, and counsel for the City agreed, saying this: "I agree with the Court. We need to know the operative pleadings so we need to know what the claims are and what the evidence is going to be about."

Counsel for plaintiffs then said they would quickly file their amended complaint, and reiterated he preferred a trial date be set. The City's counsel responded: "Your Honor, the problem with that is we likely will make another motion and the pleadings won't be resolved until Your Honor rules on the motion. So I think it makes more sense to wait until, let's say, a week after Your Honor issues your rulings on the next round."

15

promote judicial efficiency and economy—and not thwart any purpose of the anti-SLAPP law.

The City also cites *Martin*, *supra*, 198 Cal.App.4th 611 as indicating that the preferred procedure is to decide the SLAPP motion first, before the demurrer. Not only is *Martin* unavailing,[10] we fail to see the efficacy of this, especially as the situation was caused by the City's own conduct. Put otherwise, no one made the City file the demurrer or the standard motion to strike, both set for hearing, we note, weeks before the scheduled hearing date of the SLAPP motion. In sum, Judge Lee wisely did what she did rather than analyze would have been a superseded complaint. She did not err.

Beyond all that, we do not understand the City's lengthy focus on the issue, as the City goes on to ask us to rule on the SLAPP motion. Plaintiffs agree. And, because our review is de novo, we will do that. (See *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 468 (*Hecimovich*) [appellate court can consider step two analysis, despite that trial court did not]; *Roberts v. Los Angeles County Bay Assn.* (2003) 105 Cal.App.4th 604, 615–616.)

We now turn to that analysis, beginning with the law of anti-SLAPP.

**Anti-SLAPP Law and the Standard of Review**

We have on numerous occasions explained the operation of the anti-SLAPP law. *Hecimovich*, *supra*, 203 Cal.App.4th 450, is illustrative.

"Subdivision (b)(1) of section 425.16 provides that '[a] cause of action against a person arising from any act of that person in furtherance of the

---

[10] In *Martin, supra*, 198 Cal.App.4th at pp. 616–617 the trial court actually granted a SLAPP motion with leave to amend, and the Court of Appeal affirmed. So, *Martin*'s observation regarding the order in which a trial court should proceed is dictum.

16

person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.' Subdivision (e) of section 425.16 elaborates the four types of acts within the ambit of a SLAPP . . . .

"A two-step process is used for determining whether an action is a SLAPP. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity, that is, by demonstrating that the facts underlying the plaintiff's complaint fit one of the categories spelled out in section 425.16, subdivision (e). If the court finds that such a showing has been made, it must then determine the second step, whether the plaintiff has demonstrated a probability of prevailing on the claim. [Citation.]

" 'The Legislature enacted section 425.16 to prevent and deter "lawsuits [referred to as SLAPP's] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) Because these meritless lawsuits seek to deplete "the defendant's energy" and drain "his or her resources" [citation], the Legislature sought " 'to prevent SLAPPs by ending them early and without great cost to the SLAPP target' " [citation]. Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation.' [Citation.]

"Finally, and as subdivision (a) of section 425.16 expressly mandates, the section 'shall be construed broadly.'

17

"With these principles in mind, we turn to a review of the issues before us, a review that is de novo." (*Hecimovich, supra*, 203 Cal.App.4th at pp. 463–464.)

**The Complaint is Not Based on Protected Activity**

Our colleagues in Division Four elaborated on step one of the SLAPP analysis, in *Area 51 Productions, Inc. v. City of Alameda* (2018) 20 Cal.App.5th 581, 594–595 (*Area 51*). Citing and quoting numerous cases, they began with this:

"*The First Step of the Anti-SLAPP Analysis*:

"In applying section 425.16, subdivision (b)(1), the mode of proceeding and the applicable analysis at the often-elusive first step have been worked out in some detail in the case law. '[T]he court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' (§ 425.16, subd. (b)(2).) 'To determine whether a cause of action arises from protected activity, we disregard its label and instead examine its gravamen "by identifying '[t]he allegedly wrongful and injury-producing conduct . . . that provides the foundation for the claim.' " [Citation], i.e., " 'the *acts on which liability is based*,' " . . . [citations]; *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 (*City of Cotati*) ['the statutory phrase "cause of action . . . arising from" means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech' "].)

" 'A claim arises from protected activity when that activity underlies or forms the basis for the claim.' (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1062 (*Park*).) 'Critically, "the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech." [Citations.] [T]he focus is

18

on determining what "the defendant's activity [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning." ' (*Id.* at p. 1063.) 'If the core injury-producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity, collateral or incidental allusions to protected activity will not trigger application of the anti-SLAPP statute.' (*Hylton v. Frank E. Rogozienski, Inc.* (2009) 177 Cal.App.4th 1264, 1272; see *City of Colton v. Singletary* (2012) 206 Cal.App.4th 751, 767 (*Singletary*) ['the question is whether the protected activity is merely an incidental part of the cause of action'].)

"Essentially, the 'court must "distinguish between (1) speech or petitioning activity that is mere *evidence* related to liability and (2) liability that is *based on* speech or petitioning activity. Prelitigation communications . . . may provide evidentiary support for the complaint without being a basis of liability." [Citation.] "[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute." ' [Citations.] The most recent guidance provided by our Supreme Court is that, in teasing out whether we are dealing with protected conduct under section 425.16, subdivision (b), 'courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.' (*Park, supra*, 2 Cal.5th at p. 1063.)" (*Area 51, supra*, 20 Cal.App.5th at pp. 594–595.)

Our Supreme Court has instructed that on the first step of the SLAPP analysis, "the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them" (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396 (*Baral*)), and that "allegations of

19

protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Id.* at p. 394.)

As quoted above, the City's SLAPP motion claimed to distill plaintiffs' complaint in these five lines: "Plaintiffs allege the City breached its contractual obligations and committed torts by engaging in seven categories of wrongdoing; six are protected activity: (1) defending a lawsuit; (2) asserting a default; (3) interfering with funding; (4) interfering with rail; (5) interfering with permitting; and (6) other miscellaneous conduct."

The City's position on appeal is similar, now describing plaintiffs' complaint as including "seven categories of protected activity." In the City's words, "Plaintiffs allege the City breached its contractual obligations and committed torts by engaging in seven categories of protected activity: (1) defending against OBOT's claims in the federal case and appealing the federal court's ruling in that action [citation]; (2) interfering with funding by writing a letter to the ACTC [Alameda County Transportation Commission] and introducing an ACTC resolution that would condition disbursement of ACTC funding for the Terminal on a promise not to handle coal [citation]; (3) opposing OGRE's STB petitions [citation]; (4) interfering with permitting applications through the "Cappio Memo"[11] and City employees' statements at a March 9, 2016 meeting about permit applications related to the Terminal [citation]; (5) failing to negotiate a Rail Access Agreement with the Port [citation]; (6) issuing letters to OBOT asserting that OBOT was in default under the Ground Lease [citation]; and (7) public statements by City 'elected officials' voicing opposition to coal handling at the Terminal."

_____

[11] The "Cappio Memo" was a 2015 memorandum by City Administrator Claudia Cappio that plaintiffs claimed caused confusion concerning permitting applications for the project.

20

Allegations about those things might be in the complaint. But they are only evidence of the City's wrongdoing, evidence supporting plaintiffs' claims. They are not the gravamen of them.

As alleged in the complaint, and supported by the Morodomi, Siegel, McClure, and Tagami declarations, plaintiffs' claims arise out of various acts in breach of the City's agreements with OBOT or are tortious. The acts include the City's refusals to cooperate with plaintiffs to pursue available funding for the project; to cooperate with OGRE's effort to obtain approvals from the Surface Transportation Board (STB); to issue permits, including a fence permit to secure the West Gateway; to use commercially reasonable efforts to execute the rail access agreement; to honor OBOT's invocation of force majeure (the definition of which includes "acts of the government, acts of the other Party") after the City's actions caused development delays. They also include private and public statements by City officials threatening to kill the project if plaintiffs do not comply with the illegal resolution banning coal.

More specifically:

Section 6.3 of the lease requires the parties to "cooperate in the identification and pursuit of third-party funds necessary" to complete certain improvements for the project. Plaintiffs' complaint arises in part out of the City's failure to cooperate with them to secure funding for the project, and its interference with the ACTC's disbursement of funds to the project. Indeed, plaintiffs' evidence in opposition to the SLAPP motion included that as recently as October 2018, OBOT asked the City to apply for available funding for the project from ACTC, and that the City neither responded to OBOT's request nor otherwise sought available funding.

The City reads—more accurately, misreads—the complaint by asserting that plaintiffs' claim arises out of the "(1) the introduction of a

21

Resolution to prevent the release of these funds by the City's representative . . . and (2) a letter sent by the City's mayor and a councilmember to ACTC opposing disbursements of funds for the Terminal." But these acts are not the basis for plaintiffs' claim, merely evidence of the City's failure to honor its contractual obligations. As the Supreme Court noted in *Park*, "[A] claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Park*, *supra*, 2 Cal.5th at p. 1060.) In sum, this claim arises out of the City's breach of its obligation to cooperate, not its representatives' speech opposing disbursement of funds.

Plaintiffs' complaint arises in part out of the City's refusal to issue permits for the project, including a permit to build a fence to secure the West Gateway. In support of this, project manager Morodomi submitted a declaration that detailed her efforts to obtain a permit to construct a fence along the area commonly known as MH-1 Lease Area and the West Gateway. She explained that both MH-1 Lease Area and the West Gateway were the targets of multiple burglaries and vandalism, and the sites needed security. When Morodomi attempted to obtain the fence permit from the City's building department, the City refused to issue it. This is not protected activity. (*Shahbazian v. City of Rancho Palos Verdes* (2017) 17 Cal.App.5th 823, 826 [a governmental entity's decision to issue or deny a building permit is not protected activity].)

Beyond that, the City's position is based on a fundamental misstatement, the assertion that plaintiffs never submitted a permit application to the City and the City thus never denied one. In other words, the City simply ignores plaintiffs' substantiated allegations, and replaces

22

those allegations with its own version of facts to attempt to show the claims arise out of protected activity.

As to the "Cappio Memo," not only is plaintiffs' claim not based on it, the City's reliance on it is irreconcilable with its assertion that it never denied a permit to plaintiffs. That is, the City argues its conduct is protected activity under subdivision (e)(2) because "it related to an issue (permitting) that was under consideration or review by an executive body (the Planning and Building Department)." In other words, the City asserts that OBOT never submitted a permit application, and at the same time argues that the statements were made while permits were under consideration or review by an executive body. Such disingenuousness aside, it cannot succeed. (See *Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 627 ["if an issue is not presently 'under consideration or review' by such authorized bodies, then no expression—even if related to that issue—could be 'made in connection with an issue under consideration or review' "].)

Section 5.2.3 of the lease requires the City to "use commercially reasonable efforts to enter into 'Rail Access Agreement' (as defined in the Amended and Restated CSA) with the Port" that permits OBOT and OGRE to access the property, including the rail R/O/W. According to plaintiffs, the City has not executed a rail access agreement, and plaintiffs' claim arises in part out of the City's breach of section 5.2.3, and its refusal to use commercially reasonable effort to execute the rail access agreement.

The City asserts that "plaintiffs do *not* actually challenge the City's failure to obtain a rail access agreement." The argument misconstrues the allegations of the complaint, not to mention the evidence submitted in opposition of the SLAPP motion. Again, the City's attempt to replace plaintiffs' allegations with the City's version of the facts must fail. (See

23

*Medical Marijuana, Inc. v. ProjectCBD.com* (2016) 6 Cal.App.5th 602, 621 [courts will not "redraft" a complaint to read the document as alleging protected conduct].) This breach of the lease is not protected activity.

Plaintiffs' claims also include that the City has thwarted development of the project by withholding contractual benefits from OBOT, this despite the ruling in the federal action that the coal ban was illegal and unenforceable. Plaintiffs claim the City relied on a false and pretextual claim that OBOT had committed an unmatured event of default in order to withhold contractual benefits. They also claim that the City breached its contractual obligations by, among other things, failing to honor OBOT's right to invoke force majeure benefits. In short, plaintiffs' claims challenge the manner in which the City performed under the lease, its role as a government entity merely collateral to its role as a contracting party.

Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing arises in part out of the attempts by City officials to, in plaintiffs' words, "kill the project." As to this, *Richmond Compassionate Care Collective v. 7 Stars Holistic Foundation, Inc.* (2019) 32 Cal.App.5th 458 (*Richmond Compassionate Care Collective*) is apt. There, the complaint alleged a Cartwright Act claim, alleging in essence that defendants, acting in concert, encouraged and paid for community opposition to Richmond Compassionate Care Collective's (RCCC) applications before the Richmond City Council for a marijuana dispensary permit, and that defendants also purchased a favorably zoned property. Defendants filed a SLAPP motion, which was granted in an order that among other things held that "supporting and encouraging others to oppose plaintiff's application before the City Council" were "statements or conduct made in connection with . . . official proceedings" and "the location of a medical marijuana facility is a public

24

issue." And, the court concluded, the allegations "related to efforts to mobilize public opposition to plaintiff's application and to obtain a decision from the Richmond City Council . . . shall be stricken from the complaint. [But,] the allegations of the complaint related to the purchase of real property . . . shall not." (*Id.* at p. 461.)

Plaintiff filed a first amended complaint and then a second, to both of which demurrers were sustained with leave to amend. And then came the third amended complaint (TAC), a lengthy complaint that also included 17 exhibits consisting of text images, emojis, and the notes of one defendant, Hirschhorn, who, it developed, had turned on the other defendants and was now assisting plaintiff. Hirschhorn's declaration described how "our group declared war on RCCC," and set forth in detail all that "the group" did in furtherance of that "war." (*Richmond Compassionate Care Collective*, *supra*, 32 Cal.App.5th at pp. 461–462.)

Two defendants filed another SLAPP motion (along with a demurrer). (*Richmond Compassionate Care Collective*, *supra*, 32 Cal.App.5th at p. 461.) The trial court denied the SLAPP motion, along the way chastising defendants' counsel for misreading the TAC. (*Id.* at p. 466.) We affirmed, concluding as follows: "The gravamen of RCCC's Cartwright Act claim is set forth at length, and in detail, in the TAC, a complaint whose factual allegations are based on Hirschhorn's declaration. We need not repeat all that here, but suffice to repeat her introductory paragraph: that from 2011 through 2015 the group, 'declared war on RCCC. We conspired to prevent RCCC from getting any property in Richmond. . . .' As Hirschhorn went on to describe, in pursuit of that conspiracy 'the group' employed various tactics to block RCCC from buying or leasing conforming properties in Richmond. . . .

25

"The essence of RCCC's TAC was the private actions the group took to restrain trade and monopolize the medical marijuana market in Richmond. That was the gravamen, the thrust, of the cause of action. Whatever the protected activity, it was at the most incidental. [Citations.]" (*Richmond Compassionate Care Collective, supra*, 32 Cal.App.5th at p. 470.)

There, in Hirschhorn's words, there was a "war." Here, in plaintiffs' words, the city attempted to "kill" the project. It is not protected activity.

Without providing any substantive analysis, the City claims that statements by city officials are protected activity as a " 'statement or writing made in a place open to the public or a public forum in connection with an issue of public interest.' " In claimed support, the City cites *Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1436, noting that the Terminal's potential to handle coal "generated significant public concern in Oakland." But a statement made in connection with an issue of public interest must do more than " 'refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate.' "[12] (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 150.)

Finally, we note that the City does not even attempt to analyze the conduct underlying any of plaintiffs' seven tort claims. Instead, the City argues that "each tort claim . . . incorporates by reference all of these specific alleged instances of breach." To no avail. As the Court of Appeal put it in *Oliveras v. Pineda* (2019) 40 Cal.App.5th 343, 348: "Although the fourth cause of action incorporates all prior paragraphs of the first amended complaint, . . . the incorporated allegations of protected activity merely

---

[12] The City's reply brief accuses plaintiffs of misrepresenting its argument, asserting that it is not based on subdivision (e)(4), on which, the City claims, it "does not rely." As indicated above, we read the City's SLAPP motion differently.

26

provide context and are not the basis for plaintiffs' claim for recovery under Civil Code section 1950.5."

Here, while plaintiffs' tort claims (i.e., the fourth through tenth causes of action) do incorporate prior paragraphs of the complaint, the majority of the incorporated allegations of protected activity provide the context of the claims. For example, as the basis of its fourth cause of action, for fraudulent inducement, plaintiffs allege misrepresentations as to the City's: (1) "promise to perform under the Lease"; (2) "promise to cooperate in the completion of the Project"; (3) "promise that certain funds generated by Measure BB would be allocated and disbursed to OBOT to build Wharf Improvements"; and (4) "promise that the City would cooperate with plaintiffs [to] obtain permits and funding from third-parties." The fifth through seventh causes of action for economic interference are based on the City's refusal to issue non-disturbance agreements and proper estoppel certificates for OBOT's subtenants. And the eighth through tenth causes of action are based on the City's refusal to turn over to OBOT the rail R/O/W, its refusal to issue a non-disturbance agreement to OGRE, and its failure to issue a valid estoppel certificate. That is not protected activity.

*Area 51*, *supra*, 20 Cal.App.5th 581, is instructive. There, plaintiff event promotion company had a long-standing relationship with the City of Alameda to license the use of certain city property to plaintiff for events it helped plan and promote with third party companies. The city decided to cease doing business with plaintiff, which left plaintiff on the hook to a number of entities based on commitments undertaken in reliance on previous confirmation of the city's willingness to license event space. Plaintiff sued the city, alleging six causes of action. Defendants filed a demurrer and a

27

SLAPP motion. The trial court sustained the demurrer with leave to amend and denied the SLAPP motion, and the city appealed. (*Id*. at pp. 586–587.)

Our colleagues in Division Four affirmed the order denying the SLAPP motion with respect to the first five causes of action, holding as follows: "Insofar as plaintiff's first five causes of action were asserted against the City, the trial court was correct to conclude that these causes of action did not arise from protected activity under [section] 425.16. Although the claims were cast differently, under distinct legal theories, the act of reneging on a commitment to license the use of certain City property for events plaintiff helped plan and promote with third party companies was an indispensable feature in all of them. The communications that led to and that followed the alleged injury-producing conduct—refusal to license to plaintiff—were merely incidental to the asserted claims." (*Area 51*, *supra*, 20 Cal.App.5th at p. 581.)

Likewise here. The essence of the complaint, supported by the declarations of Tagami, Morodomi, McClure, and Siegel, was that plaintiffs' claims arose out of the City's acts or omissions in breach of its agreements with OBOT, its refusal to cooperate, its stonewalling, and its tortious conduct, all as described above. That is what plaintiffs' complaint is based on, and whatever else may be in the complaint, it is the background and context—the evidence—to support that complaint.

At oral argument, counsel for the City pointed to two paragraphs in the complaint that included among their many allegations that the City defended against the federal action, and, counsel went on, we thus had to hold that step one of the anti-SLAPP statute was met and had to reach step two. Assuming without deciding that the City's sparse arguments in its moving papers support the making of such an argument, the complete answer is that, as noted, Judge Lee struck five paragraphs from the complaint, two of which,

28

156 and 168, contain the allegation that the City "breached the lease and Development Agreement by the assertion of a defense of the illegal Ordinance and Resolution in the trial court and prosecution of appeal." So, those allegations are no longer in a pleading.

### Some Closing Observations—and a Plea

*Grewal v. Jammu* (2011) 191 Cal.App.4th 977 (*Grewal*) involved a SLAPP motion following an amended complaint, a motion made over three years after the lawsuit was filed. The trial court denied the motion, and defendants appealed, the effect of which was to stay the action. We easily affirmed the denial, with observations as to how the anti-SLAPP procedure can, in the wrong hands, be abused, "resulting in substantial cost—and prejudicial delay." (*Id.* at p. 981.)

The penultimate section in *Grewal* was entitled "The Anti-SLAPP Statute: Its Purpose, Use, Misuse, and Abuse," where we cited and discussed many cases in which courts had voiced concerns that the anti-SLAPP law was being used in ways never foreseen. We also quoted a letter from Penelope Canan, one of the two law professors whose work was the basis of the anti-SLAPP statute, who, writing the legislative analyst in connection with proposed legislation to amend the statute, lamented as follows: "Anti-SLAPP legislation is intended 'to provide citizens who are sued for speaking out with a speedy and relatively inexpensive defense mechanism against attacks on their First Amendment rights by SLAPPs.' [¶] How ironic and sad, then, that corporations in California have now turned to using meritless anti-SLAPP motions as a litigation weapon. This turns the original intent of one of the country's most comprehensive and effective anti-SLAPP laws on its head."

Among the cases we cited was *Moran v. Endres* (2006) 135 Cal.App.4th 952, an appeal by defendants who had been denied attorney fees in the setting where they had prevailed in obtaining dismissal of only "one of many causes of action." (*Id.* at p. 953.) Affirming that denial, an exasperated court observed: "Section 425.16 was enacted because the Legislature found that 'it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process.' Neither the public's nor defendant's right to participate was advanced by this motion." (*Id.* at p. 955.) A concurring justice added this: "Code of Civil Procedure section 425.16 . . . has resulted in numerous appeals that involve various ambiguities and apparent unintended consequences." (*Id.* at p. 956.)

*Grewal* ended with a section entitled, "A Losing Defendant's Right to Appeal is the Aspect of the Anti-SLAPP Statute Most Subject to Abuse." (*Grewal*, *supra*, 191 Cal.App.4th at p. 1000.) As to that right, before the year 1999 orders granting SLAPP motions could be "appealed directly under most circumstances," but orders denying such motions could "only be reviewed by a writ until the proceedings in the trial court" were complete. (Braun, *Increasing SLAPP Protection: Unburdening the Right of Petition in California* (1999) 32 U.C. Davis L.Rev. 965, 1008.) In 1998, at the request of the Judicial Council, Professors Canan and Pring prepared a report that recommended seven improvements to the original anti-SLAPP statute, including authorization for an immediate right of appeal from orders denying SLAPP motions. (Braun, *California's Anti-SLAPP Remedy After Eleven Years* (2003) 34 McGeorge L.Rev. 731, 778–789 & fn. 280.) The Judicial Council reported those recommendations to the Legislature, but the Council's report rejected all seven recommendations. (*Ibid.*) In rejecting the proposal

for an immediate right of appeal, the Judicial Council insisted no such right was necessary because review by writ petition was "sufficient." (*Id*. at p. 761 & fn. 182.)

The Legislature overrode the Judicial Council's recommendation against an immediate right to appeal by enacting Assembly Bill No. 1675, which amended the anti-SLAPP statute to expressly provide that "[a]n order granting or denying a special motion to strike shall be appealable." (Stats. 1999, ch. 960, § 1, p. 6957.)

As we said in *Grewal,* "The right of a defendant to appeal a losing anti-SLAPP motion quickly became, like so much else of the anti-SLAPP procedure, the subject of criticism. Indeed, such criticism was acknowledged by the Legislature itself in 2003 when, in discussing Senate Bill No. 515 (2003–2004 Reg. Sess.), the Senate Judiciary Committee noted the claim by the proponent of the bill 'that current law is being used by defendants to unreasonably delay a case from being heard on the merits, thus adding litigation costs and making it more cumbersome for plaintiffs to pursue legitimate claims. . . . The filing of the meritless SLAPP motion by the defendant, even if denied by the court, is instantly appealable, which allows the defendant to continue its unlawful practice for up to two years, the time of the appeal.' (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003, p. 15.)" (*Grewal, supra*, 191 Cal.App.4th at p. 1001.)

Despite those criticisms and concerns, section 425.16 was left untouched.[13]

---

[13] Code of Civil Procedure section 425.17 was amended to delete the right to appeal.

*Grewal* also discussed *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180 (*Delfino*), where the issue was whether a defendant's appeal of the denial of a SLAPP motion automatically stayed further trial court proceedings. The Supreme Court held it did. But even so, the Court expressed its concern: "In light of our holding today, some anti-SLAPP appeals will undoubtedly delay litigation even though the appeal is frivolous or insubstantial. As the Court of Appeal observed and plaintiffs contend, such a result may encourage defendants to 'misuse the [anti-SLAPP] motions to delay meritorious litigation or for other purely strategic purposes.' " (*Id*. at p. 195.)

"Delay" indeed. "Purely strategic purposes" indeed. Two short sentences in *Grewal* bear repeating: "A well-known saying, generally attributable to William Gladstone, is that 'justice delayed is justice denied.' A lesser known saying, known to be attributable to prominent defense lawyers from major law firms, is that 'justice delayed is justice.' " (*Grewal*, *supra*, 191 Cal.App.5th at p. 999.)

Following discussion of other cases expressing concern about the abuse, we ended our opinion in *Grewal* with these two paragraphs:

"We do not disagree that the right to appeal can be 'important.' But it should not trump all else. And a losing defendant's 'loss' of the right to appeal a lost anti-SLAPP motion, we submit, is a much smaller price to pay than a winning plaintiff having to expend thousands of dollars in attorney fees on appeal, while the plaintiff's case is stayed for anywhere from 19 to 26 months, all in a setting where the original motion was without merit, if not downright frivolous.

"It is now almost five years since plaintiff filed his lawsuit, and trial is not yet in sight. Such delay hardly seems defensible, particularly when it is

32

due in no small part to nonmeritorious appeals by defendants who lost anti-SLAPP motions, the first appeal voluntarily dismissed after languishing for a long period [citation], and this appeal rejected as utterly without merit. As we said, something is wrong with this procedure, and we hope the Legislature will see fit to change it." (*Grewal*, *supra*, 191 Cal.App.5th at p. 1003.)

We understand that efforts to amend the anti-SLAPP statute were attempted, without success.

The anti-SLAPP law evolved and developed, and the criticism about abuse continued, perhaps best collected in the four-page discussion in *Hewlett-Packard Co. v. Oracle Corp.* (2015) 239 Cal.App.4th 1174 (*Hewlett-Packard*). There, Oracle—hardly the public participant Professors Canan and Pring had in mind—brought a SLAPP motion on the "very eve of trial on the questions of breach and remedy," after the trial court in a bifurcated trial found against Oracle on a key issue. So, the motion was untimely, not to mention, in the words of the Court of Appeal, "utterly without merit." Oracle brought the motion nevertheless, it was denied, and Oracle appealed, thus staying the case in the trial court. (*Id.* at p. 1178.)

This did not sit well with the Court of Appeal. And, in a comprehensive exposition of the problem, the court noted that many courts and commentators had attempted to "draw attention—particularly legislative attention—to the 'explosion of anti-SLAPP motions' " (*Hewlett-Packard*, *supra*, 239 Cal.App.4th at p. 1184), going on to say this: "A major reason for this explosion is that the statute rewards the filer of an unsuccessful anti-SLAPP motion with what one court has called a 'free time-out' from further litigation in the trial court. ([*People ex rel. Lockyer v.*] *Brar* [(2004)] 115 Cal.App.4th 1315, 1318.) The statute does this by entitling the

unsuccessful movant to *immediately appeal* the denial of such a motion—even one like Oracle's, which wholly lacks merit, attacks only a small part of the plaintiff's case, and is heard nearly two years into the lawsuit, and on the day before a scheduled trial.  (§ 425.16, subd. (i).)  Such an appeal automatically stays all further trial proceedings on causes of action 'affected by the motion.'  (*Varian Medical Systems, Inc. v. Delfino*[, *supra*,] 35 Cal.4th [at p.] 195, fn. 8; see *id.* at p. 186 . . . .)  This means that however unsound an anti-SLAPP motion may be, it will typically stop the entire lawsuit dead in its tracks until an appellate court completes its review."  (*Id.* at pp. 1184–1185.)

Development of the anti-SLAPP law continued, leading to the 2016 decision by the Supreme Court in *Baral*, *supra*, 1 Cal.5th 376.  The issue there was how the anti-SLAPP law operated in " 'mixed cause of action' " situations, that is, when a claim or cause of action involves both protected activity and unprotected activity.  Addressing a split of authority on a "question that has perplexed the Courts of Appeal" (*id.* at p. 381), the Supreme Court held that "[t]he anti-SLAPP procedures are designed to shield a defendant's constitutionally protected *conduct* from the undue burden of frivolous litigation.  It follows, then, that courts may rule on plaintiffs' specific claims of protected activity, rather than reward artful pleading by ignoring such claims if they are mixed with assertions of unprotected activity."  And, the Court went on, it agreed "that the Legislature's choice of the term 'motion to strike' reflects the understanding that an anti-SLAPP motion, like a conventional motion to strike, may be used to attack parts of a count as pleaded."  (*Id.* at p. 393.)

What has followed may be described as disagreement among Courts of Appeal as to how to apply *Baral,* as reflected in a chapter in The Rutter

34

Group practice guide entitled "Implementing *Baral v. Schnitt* In California's Trial and Appellate Courts." The author describes "some of the changes that *Baral* has made to anti-SLAPP litigation," going on to discuss 12 cases, some of which take issue with others. (Compare *Sheley v. Harrop* (2017) 9 Cal.App.5th 1147, 1168–1171; and *Okorie v. Los Angeles Unified School Dist.* (2017) 14 Cal.App.5th 574, [describing *Sheley*'s "overbroad reading of *Baral*"]; and *Optional Capital, Inc. v. Akin Gump Strauss, Hauer & Feld, LLP* (2017) 18 Cal.App.5th 95, 111, fn. 5 [declining to follow *Sheley*'s rejection of the "thrust or gravamen analysis"].) (Burke, Cal. Practice Guide: Anti-SLAPP Litigation (The Rutter Group 2019) ¶ 3.148, pp. 3-90 to 3-91.)

All this led Mr. Burke to end section 3.148 with this comment: "How California's trial and appellate courts apply *Baral v. Schnitt* to various factual scenarios is an important anti-SLAPP issue to watch. While the California Supreme Court in *Baral* sought to resolve a long-running division of appellate authority concerning *Mann v. Quality Old Time Service, Inc.* [(2004)] 120 Cal.App.4th 90, the Court's opinion appears to have far broader application beyond the resolution of 'mixed' claims issues, including how an anti-SLAPP motion may be used to strike petitioning and free speech activities alleged in only part of a cause of action (no matter how the claim is pled by the plaintiff) and how, in prong two, a portion of a plaintiff's 'claim' may be struck even though portions of the cause of action may remain. How the automatic stay of discovery, immediate right of appeal and mandatory attorney's fees provisions of the anti-SLAPP statute will be affected by *Baral* also remains to be seen." (Burke, Cal. Practice Guide: Anti-SLAPP Litigation, *supra*, ¶ 3.148, p. 3-92.)

As the comment alludes in its reference to "immediate right of appeal," the issues that "remain[] to be seen" should include whether an appeal by a

losing defendant automatically stays the proceedings below in the mixed cause of action setting, where all agree the plaintiff's case must proceed. After all, in *Delfino, supra,* 35 Cal.4th 180, 183, the case that mandated the stay, the result was all or nothing. That is, if the defendant's appeal succeeded, the case would end—which, of course, was what the anti-SLAPP statute was designed to accomplish: to provide a "quick and inexpensive method for unmasking and dismissing" unmeritorious *cases.* (*Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.* (2004) 122 Cal.App.4th 1049, 1056.) The SLAPP acronym is a "strategic *lawsuit* against public participation."

Given the setting here, at oral argument we asked counsel for the City what proper motive could exist for this appeal. His response was that to the extent the SLAPP motion would succeed, the City would be entitled to attorney fees. In other words, this appeal, with its attendant delay and the generation of thousands and thousands of dollars of attorney fees, was justified by the City's possible claim to attorney fees. We have two comments.

First, we know of no law that says an amended complaint somehow causes a defendant to lose its right to attorney fees if a SLAPP motion is successful. To the contrary, there is law that holds fees can be awarded in such circumstance. (See *Richmond Compassionate Care Collective v. 7 Stars Holistic Foundation* (2019) 33 Cal.App.5th 38 [action allowed to proceed following third amended complaint; attorney fees for partially successful SLAPP motions affirmed].)

Second, assuming the City were to be successful, just how much does the City expect to be awarded for the successful striking of two lines in a 63-page complaint?

We said it in *Grewal*, *supra*, 191 Cal.App.4th 977, and we'll say it again: "something is wrong with this picture." And we end with the observation that perhaps the time has come for the Supreme Court to revisit the issue of an automatic stay, at least in the situation where it is indisputable that the action will proceed.

## DISPOSITION

The order denying the SLAPP motion "without prejudice" is reversed, and the matter is remanded to the superior court with directions to enter an order denying the motion on the merits. Plaintiffs shall recover their costs on appeal.

                                              _____

                                              Richman, Acting P.J.

We concur:


_____

Stewart, J.


_____

Miller, J.

*Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*
(A157330)

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Honorable Jo-Lynne Q. Lee |
| Attorney for Plaintiffs and Respondents Oakland Bulk and Oversized Terminal, LLC et al.: | Manatt, Phelps & Phillips, LLP, Benjamin G. Shatz, Barry W. Lee, Christopher L. Wanger, Ana G. Guardado; |
| Attorney for Defendant and Appellant City of Oakland: | Altshuler Berzon, James M. Finberg; Oakland City Attorney, Barbara J. Parker, Maria S. Bee, Jamilah A. Jefferson. |